964 F.2d 611
 60 USLW 2743
 Jane DOE, Plaintiff-Appellee,
v.
George D. SMALL, Mayor of the City of Ottawa, Illinois,
Barbara J. Lindquist, William C. Ferguson, Alan R. Howarter,
William N. Stevenson, Members of the City Council of the
City of Ottawa, Illinois and City of Ottawa, Illinois, a
municipal corporation, Defendants,
and
Ottawa Freedom Association, Limited, Intervening Defendant-Appellant.
 No. 89-3756.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 7, 1990.
Reargued Dec. 19, 1991.
Decided May 15, 1992.
As Amended May 18, 1992.
 
 Joseph R. Lundy, Deborah A. Golden, Schiff, Hardin & Waite; Harvey M. Grossman, Jane M. Whicher (argued), Roger Baldwin Foundation, Chicago, Ill.; Donald S. Rothschild, Rothschild & Associates, Oak Park, Ill.; and Elmer Gertz, Chicago, Ill., for plaintiff-appellee.
 Joel G. Chefitz (argued) Cynthia Photos Abbott, Paul A. Haskins, Patrick J. Lamb, Katten, Muchin & Zavis, Chicago, Ill.; George C. Hupp, Jr., Hupp, Lanuti, Irion & Martin, Ottawa, Ill.; and Robert K. Skolrood, Nat. Legal Foundation, Virginia Beach, Va., for Intervenor-Appellant.
 Judson H. Miner, Davis, Miner, Barnhill & Galland; and Sylvia Neil, Chicago, Ill., for American Jewish Congress, amicus curiae.
 Jeffrey P. Sinesky, Steven M. Freeman, Jill L. Kahn, Richard E. Shevitz, Michael A. Sandberg, Anti-Defamation League of B'Nai B'Rith, New York City; James D. Holzhauer, Robert A. Helman, and Thomas C. Berg, Mayer, Brown & Platt, Chicago, Ill., for Anti-Defamation League of B'Nai B'Rith, amicus curiae.
 Before BAUER, Chief Judge, CUMMINGS, WOOD, Jr.,* CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION, and KANNE, Circuit Judges.
 COFFEY, Circuit Judge.
 
 
 1
 The Ottawa Freedom Association ("OFA")[1] appeals the district court's entry of summary judgment enjoining the City of Ottawa from allowing any person or group from displaying the paintings at issue in Washington Park in Ottawa, Illinois. Because this injunction is overbroad and infringes on the free speech rights of any private person desiring to display the paintings, we reverse.
 
 I. FACTS[2]
 A. The Paintings
 
 2
 In 1956 the Ottawa Retail Merchants' Association, a private organization, commissioned the painting of sixteen canvases depicting scenes from the life of Christ in an effort to "put Christ back in Christmas." These paintings were displayed in Washington Park, located in the heart of the City of Ottawa, Illinois, during the Christmas season from 1957 to 1969 and again in 1980 through 1988. Except for the years 1964 through 1967, when the City arranged for the erection of the paintings, the display has been exhibited by private parties.
 
 
 3
 The paintings were not displayed during the 1970s but were stored under an old grandstand structure and apparently forgotten. According to a 1980 Ottawa newspaper article, the City Parks Superintendent who discovered the paintings under the old grandstand stated:
 
 
 4
 " 'We've got to find a home for them, got to find an owner,' he said. 'This building will be torn down early next spring, and the city doesn't have another place big enough to store them.' "
 
 
 5
 Upon reading about the discovery of the paintings, the local chapter of the Junior Chamber of Commerce (Jaycees), a national service-oriented organization, contacted the City and volunteered to take charge of the paintings; the Jaycees were the caretakers of the paintings until they transferred their custody to the OFA shortly before the request for rehearing en banc.
 
 
 6
 When the paintings were displayed, they occupied less than one-half of the west side of Washington Park in a slightly V-shaped angle (150? ), and the vertex of the display was forty-eight feet from the street. Including the area between the paintings and the sidewalk, the paintings occupied 6.34 percent of the Park. A 20 1/2" wide by 21" high sign with letters 1 1/16"' high, clearly legible from the sidewalk but not from across the street, accompanied the paintings and stated: "THIS DISPLAY HAS BEEN ERECTED AND MAINTAINED SOLELY BY THE OTTAWA JAYCEES, A PRIVATE ORGANIZATION, WITHOUT THE USE OF PUBLIC FUNDS."[3]
 
 B. The Forum
 
 7
 Washington Park is a quintessential public forum well removed from the seat of the City government; City Hall is some three blocks away, and no City buildings border the park. Deposition testimony from a number of Ottawa residents established that Washington Park has historically been an open public forum with free and equal access to all for lawful purposes. Space in the Park is allocated on a first-come, first-served basis, without specific permission from the City:
 
 
 8
 "Q. So if I wanted to display my pictures depicting worship of the devil tomorrow in Washington Park, I could just go in and put up those displays, is that correct?
 
 
 9
 * * * * * *
 
 
 10
 "The Witness: You can put them up, we might have to have, maybe, the engineer or someone that knows where the wiring is at so you don't get electrocuted, but yes.
 
 
 11
 * * * * * *
 
 
 12
 "Q. And other than checking the wiring in the ground, are there any other limits on installing concrete holes in the park?
 
 
 13
 "A. No.
 
 
 14
 "Q. So I could place these holes anywhere in the park without seeking City of Ottawa's permission, so long as I complied with the wiring in the ground, is that correct?
 
 
 15
 "A. Yes.
 
 
 16
 "Q. And the City Engineer would advise me as to whether or not I was complying with any requirements or concerns with respect to wiring in the ground?"A. Yes.
 
 
 17
 * * * * * *
 
 
 18
 "Q. And I could, in fact, use the Jaycee holes to display paintings depicting devil worship without seeking the permission of the City of Ottawa, is that correct?
 
 
 19
 "A. That's correct.
 
 
 20
 * * * * * *
 
 
 21
 "Q. I could do so without seeking the permission of the Ottawa Jaycees?
 
 
 22
 "A. Yes.
 
 
 23
 "Q. So long as I got there first?
 
 
 24
 "A. Yes."
 
 
 25
 Deposition of City Council Member William C. Ferguson at 44, 86-88.
 
 
 26
 Unrestricted public access to Washington Park dates back some 133 years to 1858 when Abraham Lincoln and Stephen Douglas used the Park for one of their famous debates. In 1988, President Bush likewise chose Washington Park as a forum for a speech and rally during his presidential campaign. According to City records, the Park has been the site of a broad array of private activities in recent years, including religious activities:
 
 1982
 
 27
 June 19, 1982 Residents Against Polluted Environment sponsored "Earth Day"
 
 
 28
 Aug. 2, 1984 Tora! Tora! held a concert for world peace
 
 1983
 
 29
 Oct. 29, 1983 Open air meeting sponsored by the Congregation of the New Life Ministry, Inc.
 
 1984
 June 28, 1984 Special Church Service
 July, 1984 Religious Concert
 Aug., 1984 Concert for World Peace
 Aug., 1984 Cut a Thon by Cosmetologists
 1985
 
 30
 Jan., 1985 Illinois Valley Citizens for Life Prayer Vigil
 
 May, 1985 Concert in Washington Park
 
 31
 June, 1985 United Methodist Church Services
 
 July, 1985 University Women Book Sale
 
 32
 July, 1985 Grade School Band Social and Concert
 
 Oct., 1985 United Way Lunch
 1986
 June, 1986 Camp Fire Girls Ceremony
 June, 1986 Art League Display
 June, 1986 Pastor Reed Church Service
 July, 1986 Arts & Crafts Show--Art League
 July, 1986 A.A.U.W. Book Sale
 July, 1986 Decatur Park Concert
 Aug., 1986 Grade School Band Concert
 Aug., 1986 Flea Market
 Aug., 1986 A.A.U. Book Sale
 
 33
 Sept., 1986 Ottawa Lioness Club Flea Market
 
 
 34
 Sept., 1986 Nam Vets POW/MIA National Recognition Ceremony
 
 1987
 
 35
 May, 1987 Ottawa Retail Council Flea Market
 
 
 36
 May, 1987 Amazing Grace Fellowship Meeting and Concert
 
 
 37
 July, 1987 New Lite Ministries Rummage Sale
 
 July, 1987 Nam Vets--Concert
 
 38
 Aug., 1987 Sesquicentennial Celebration Activities
 
 Sept., 1987 Lioness Club Flea Market
 
 39
 Sept., 1987 Nam Vets POW/MIA National Recognition Ceremony
 
 Oct., 1987 All Church Concert
 1988
 May, 1988 Mayfest Flea Market
 July, 1988 Art Show
 July, 1988 Book Sale
 July, 1988 Dance Show
 Aug., 1988 Flea Market
 Sept., 1988 Lioness Flea Market
 
 40
 Sept., 1988 POW/MIA National Recognition Ceremony
 
 
 41
 (Emphasis added.)
 
 
 42
 For many years the City of Ottawa, in the spirit of the season and "goodwill toward others," has combined with private parties in a joint effort to decorate the downtown area with festive holiday and Christmas decorations during the Yuletide season. As part of the City's decorations, it displayed a Santa Claus house in the Park each year during the 1960s and 1970s, but more recently the City displays the house in alternate years. Additionally, the lamp posts in the downtown area as well as those in and surrounding Washington Park are garnished with Christmas decorations. In 1988 the City added the "Festival of Lights" to the Christmas display in Washington Park. The "Festival of Lights" decorations included lights, candles, bows, artificial snowflakes and a fifteen-foot snowman. The lights were placed on the memorials in the Park as well as on tree branches, including those trees surrounding the paintings at issue in this appeal. The giant candles, bows, snowflakes and the fifteen-foot snowman all served as different focal points and were visible from in and around the Park. The Christmas display in the Park also included an evergreen Christmas tree displayed by the Salvation Army that provided its own focal point.
 
 C. The Dispute
 
 43
 In November of 1986, Richard Rohrer wrote a letter to the City Council requesting that the paintings be removed from Washington Park because they "represent an unacceptable endorsement of Christianity by the city and violate the constitutional rights of all Ottawans who are not Christians." On December 2, 1986, the Ottawa City Council passed the following resolution:
 
 
 44
 "WHEREAS, for many years, the City of Ottawa has celebrated the Christmas season with many public displays of seasonal decorations throughout the community, and
 
 
 45
 "WHEREAS, the downtown area of the City has, for more than 20 years, been decorated through a coordinated effort of private and public bodies, including the County of LaSalle, City of Ottawa, Ottawa Area Chamber of Commerce, Retail Merchants Association, Ottawa Jaycees and various church and other private groups owning property in or near the downtown area, and
 
 
 46
 "WHEREAS, the decorations have consisted of ornamental lighting on the streets in downtown Ottawa; ornamental lighting, Christmas trees, lighted and festooned trees throughout the downtown area; Santa Claus house on the Courthouse lawn; ornamental lighting, and eighteen large paintings celebrating the Christmas spirit in Washington Park; nativity scenes and other seasonal decorations on private property surrounding Washington Park; ornamental lighting on the Fire and Police station and other decorations in keeping with the season, and
 
 
 47
 "WHEREAS, because of a single complaint filed with it concerning the paintings in Washington Park the City has reviewed the history of the paintings and find that they were initially commissioned by the Retail Merchants Association over 20 years ago as a portrayal of 'The Greatest Story Ever Told' in conjunction with and in commemoration of the spirit of Christmas; that the Retail Merchants Association for many years erected the pictures in Washington Park as part of the Christmas decorations for downtown Ottawa in keeping with the spirit of the season; that in recent years the pictures had been maintained, erected, dismantled and stored by the Ottawa Jaycees as their part in providing appropriate decorations for the community as part of the Christmas season, and
 
 
 48
 "WHEREAS, the City Council of the City of Ottawa finds that the decorations in downtown Ottawa which have been erected for more than the last 20 years by public and private agencies truly represent a cooperative effort by the community to provide appropriate seasonal yuletide spirit so that the people attracted by the Christmas decorations to shop and otherwise do their business in the downtown area will be benefitted by the traditional, beautiful and seasonally appropriate decorations which they have come to know and love for 2 decades. The City Council specifically finds the pictures erected by the Jaycees in Washington Park are an integral part of the seasonal decorations epitomizing Christmas in the hearts and minds of the citizens of the City.
 
 
 49
 "NOW, THEREFORE, BE IT RESOLVED by the City Council of the City of Ottawa, that after due consideration and reflection upon the complaint raised concerning the pictures in Washington Park, that this council endorse the activities of the Ottawa Jaycees in maintaining, erecting, dismantling and storing said pictures and incorporating them in the overall Christmas display that annually graces the downtown area of the City and further thanks all the other groups, public and private, who also maintain, erect, dismantle and store other portions of the Christmas decorations which are integral to the annual yuletide season and the spirit thereof."
 
 
 50
 On August 11, 1988, Rohrer filed a complaint with the federal district court seeking to enjoin the display of the paintings; he modified his complaint January 11, 1989, to request that the court enjoin the exhibit unless the City placed restrictions on the frequency and duration of the display; and the complaint was once more amended on June 12, 1989, to substitute Jane Doe as plaintiff after Rohrer moved from Ottawa.
 
 
 51
 Subsequent to the filing of the suit, Mayor Small stated that the City was "going to proceed and put the pictures back in the park." Suit Filed Over Park Paintings, Ottawa Daily Times, Aug. 16, 1988. In regard to Rohrer's filing of the suit, the Mayor said:
 
 
 52
 "This is what I guess happens in a free country. If he doesn't like the paintings, then he can drive around them.... Maybe he's looking for a public reaction, but I don't want him crying when the public puts the heat on him."
 
 
 53
 Id. Several months later the City, on the recommendation of the mayor and the advice of the city attorney, changed its position in regard to the display of the paintings. At the October 18, 1988 City Council meeting, the Council voted to prohibit the display of the paintings and, as an alternative, to initiate a "Festival of Lights" as Christmas decorations for Washington Park. Shortly thereafter, the First National Bank of Ottawa offered to allow the Jaycees to display the paintings on its property located across the street from Ottawa City Hall. Upon hearing of the proposed new location for the paintings, Mayor Small stated: "It's an honor to have the pictures across the street from City Hall.... Maybe someday they'll be back in Washington Park where they belong." Paintings Get Home, Ottawa Daily Times, Oct. 21, 1988. A representative of the National Legal Foundation appeared at a special meeting of the City Council on October 28, 1988, and offered to defend the lawsuit if the City gave the Jaycees permission to proceed with displaying the paintings in Washington Park.[4] At this time, the City Council voted to rescind their decision preventing the Jaycees from displaying the paintings during the 1988-1989 Christmas season. Subsequently, the Ottawa Jaycees, represented by the National Legal Foundation, intervened as defendants and took over the defense of the lawsuit.
 
 
 54
 The Jaycees moved for summary judgment on the ground that the paintings constitute private religious speech, protected under the Free Speech Clause of the First Amendment. Doe likewise filed a motion for summary judgment, arguing that the display of the paintings in a public park violated the Establishment Clause of the First Amendment because the display constituted a state establishment of religion. The district court entered summary judgment for Doe, holding that the display of the paintings in Washington Park violated the Establishment Clause. See Doe v. Small, 726 F.Supp. 713 (N.D.Ill.1989). The judge obviously viewed the City of Ottawa as a participant in the Jaycees' speech, for he stated:
 
 
 55
 "[It] makes no difference to the analysis or result that Washington Park may be a public forum....
 
 
 56
 ....
 
 
 57
 "... City Defendants may--and must--regulate religious speech in Washington Park, including that of Jaycees, if such speech presents the danger of a violation of the Establishment Clause."
 
 
 58
 Id. at 724. The district court found that the display of the paintings violated the Establishment Clause and permanently enjoined their display in Washington Park:
 
 
 59
 "This Court has been advised that the paintings have already been put up on display for the current season. City is therefore ordered to have the paintings removed by December 8, 1989 and to forego any future display of the paintings in the Park by any group."
 
 
 60
 Id. at 725 (footnotes omitted) (emphasis added).
 
 II. ISSUES
 
 61
 The issues we address on this appeal are: 1) Whether private persons may be enjoined from engaging in religious speech in a public forum on the basis of the religious content of the speech; and 2) Whether the proper remedy was to enjoin the Jaycees' speech if the display was not purely private and therefore violated the Establishment Clause. The court is not in agreement as to whether the City violated the Establishment Clause in its conduct. Some members of the court feel that the City Council's resolution "endors[ing] the activities of the Ottawa Jaycees" in placing the paintings in the Christmas display was merely a "thank you" to the Jaycees while other members of the court believe the resolution independently or in addition to other conduct of the City to be an endorsement of the content of the paintings. We need not and will not address the issue of whether the City of Ottawa endorsed the Jaycees' religious speech because the City has not appealed.[5]
 
 
 62
 III. PRIVATE RELIGIOUS SPEECH IN A PUBLIC FORUM
 
 
 63
 The district court determined that the Jaycees' display of the paintings violated the Establishment Clause and ordered the City "to forego any future display of the paintings in the Park by any group." Doe v. Small, 726 F.Supp. at 725 (emphasis added). The district court's order was overbroad because it restrains the speech of parties who were not before it, such as the OFA or any other group that might desire to display the paintings in Washington Park in the future. In deciding to permanently enjoin the display of the paintings in Washington Park, regardless of who wished to display them, the district judge stated that "it makes no difference to the analysis or result that Washington Park may be a public forum." Id. at 724 (emphasis added). We disagree. It is well established that private religious speech is protected under the Free Speech Clause of the First Amendment. "[R]eligious worship and discussion ... are forms of speech and association protected by the First Amendment. See, e.g., Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951); Saia v. New York, 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948)." Widmar v. Vincent, 454 U.S. 263, 269, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981) (footnote omitted). As Justice O'Connor writing for the Court has noted, "there is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." Board of Educ. of Westside Community Schools v. Mergens, 496 U.S. 226, 110 S.Ct. 2356, 2372, 110 L.Ed.2d 191 (1990) (emphasis original). In enjoining "any future display of the paintings in the Park by any group," Doe v. Small, 726 F.Supp. at 725, the district judge ignored this "crucial difference."
 
 
 64
 Perry Education Association v. Perry Local Educators' Association, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) is an appropriate starting point for an analysis of whether private speech may be excluded from a quintessential public forum:
 
 
 65
 "In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the State to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939). In these quintessential public forums, the government may not prohibit all communicative activity. For the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. Carey v. Brown, 447 U.S. 455, 461, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 (1980)."
 
 
 66
 Id., 460 U.S. at 45, 103 S.Ct. at 954-55 (emphasis added). The district court found the government's obligation to avoid violating the Establishment Clause to be a sufficiently compelling interest to justify a content-based exclusion of religious speech in Washington Park. Thus, the court held that the "City Defendants may--and must--regulate religious speech in Washington Park, including that of Jaycees, if such speech presents the danger of a violation of the Establishment Clause." Doe v. Small, 726 F.Supp. at 724. While the government's interest "in complying with its Constitutional obligations may be characterized as compelling," Widmar, 454 U.S. at 271, 102 S.Ct. at 275 (emphasis added), the Supreme Court has refused to find the Establishment Clause to be a sufficiently compelling interest to exclude private religious speech even from a limited public forum created by the government. In Widmar, rather than finding the Establishment Clause to provide a sufficiently compelling interest to justify a content-based exclusion of a campus organization's religious speech from the facilities of the University of Missouri at Kansas City, the Supreme Court held that the First Amendment prohibited the university from denying the religious organization equal access to the facilities that were open to non-religious groups. The Court rejected the state's argument that Missouri's interest in the separation of church and state could justify a content-based exclusion of religious speech:
 
 
 67
 "[T]he state interest asserted here--in achieving greater separation of church and State than is already ensured under the Establishment Clause of the Federal Constitution--is limited by the Free Exercise Clause and in this case by the Free Speech Clause as well. In this constitutional context, we are unable to recognize the State's interest as sufficiently 'compelling' to justify content-based discrimination against respondents' religious speech."
 
 
 68
 Id. at 276, 102 S.Ct. at 277-78.[6] As in Widmar, the religious speech of private parties who wish to display the paintings of Christ in Washington Park are protected under the Free Exercise Clause and the Free Speech Clause. Since the State of Missouri's desire to achieve greater separation of church and state than provided for under the Establishment Clause was an insufficient interest to justify a content-based exclusion of religious speech in the limited public forum of a state university, we fail to comprehend how the Establishment Clause could constitute a sufficiently compelling state interest to justify a content-based exclusion of private religious speech in a quintessential public forum. Thus, we hold that the district judge erred in finding that the Establishment Clause provided a sufficiently compelling interest to justify a content-based exclusion of speech from Washington Park. The City of Ottawa may not exclude private persons from Washington Park merely because of the religious content of their speech.
 
 
 69
 The district court obviously assumed that the religious content of the paintings would result in some kind of a violation of the Establishment Clause regardless of what private group displayed them in Washington Park, so it ordered the City "to forego any future display of the paintings in the Park by any group." Doe v. Small, 726 F.Supp. at 725. In a footnote, the district judge said, "[t]his Court finds that the unmistakably religious content of the paintings as a group moots any time-and-manner restrictions as a saving device." Id. at n. 23. The court erred in finding that the religious content of a display in a quintessential public forum far removed from the seat of government violates the Establishment Clause, for public forums must be open to religious speech.
 
 
 70
 "[I]f a State refused to let religious groups use facilities open to others, then it would demonstrate not neutrality but hostility toward religion. 'The Establishment Clause does not license government to treat religion and those who teach or practice it, simply by virtue of their status as such, as subversive of American ideals and therefore subject to unique disabilities.' "
 
 
 71
 Mergens, 110 S.Ct. at 2371 (citation omitted). Doe argues that Ottawa has no equal access policy for Washington Park, and thus the OFA (or any other private party including the Jaycees) is not entitled to display the paintings there. But Doe bears the burden of persuasion on the issue of no equal access, and from our review of the record, it is devoid of any evidence of the City refusing to allow equal access to any and all in Washington Park within the confines of the law. In fact, we have identified and listed some thirty-plus private groups who have made use of the Park for organized events in recent years. See supra at 614. We are of the belief that if the plaintiff had discovered evidence of the City denying access to Washington Park for the purpose of a speech-related activity to anyone, she most certainly would have brought that evidence to the court's attention. In the absence of any allegation (much less actual proof) that Ottawa has denied any person access to the Park, it is immaterial that Ottawa does not have an officially stated policy of equal access, for the Constitution mandates that religious speakers may not be discriminated against in a public forum on the basis of their speech. The City of Ottawa is required to comply with the constitutional mandate regardless of whether it has an officially stated policy of doing so, and Doe has failed to demonstrate non-compliance. Moreover, the mere presence of religious symbols in a public forum does not violate the Establishment Clause, since the government is not presumed to endorse every speaker that it fails to censor in a quintessential public forum far removed from the seat of government. See Mergens, 110 S.Ct. at 2372. We hold that the district court erred in ordering the City "to forego any future display of the paintings in the Park by any group." Doe v. Small, 726 F.Supp. at 725.
 
 
 72
 Our holding that the paintings may not be excluded from Washington Park is consistent with the Supreme Court cases cited above as well as with precedent from this court. In Doe v. Village of Crestwood, 917 F.2d 1476 (7th Cir.1990), cert. denied, --- U.S. ----, 112 S.Ct. 3025, 120 L.Ed.2d 896 (1992), we reviewed an injunction prohibiting an authentic Italian mass from being said at an Italian festival. While the panel majority and the dissenting judge were in disagreement as to whether the Village of Crestwood was the sponsor of the mass, the panel was in full agreement as to the right of private parties to engage in religious expression in a public forum:
 
 
 73
 "The Park is a public forum. If the Festival, too, is open to private groups that wish to participate, and if the Crestwood Women's Club (or a church) were the sponsor of the mass, it would be difficult to find an obstacle in the Establishment Clause of the First Amendment.... A government may not close its public forums to religious practice by private parties. Widmar v. Vincent, 454 U.S. 263 [102 S.Ct. 269, 70 L.Ed.2d 440] (1981); Fowler v. Rhode Island, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953). Although the holding of the mass in a public park creates a possibility that some members of the public will assume sponsorship (as opposed to acquiescence) by the polity, the government's obligation not to discriminate against religious speech in circumstances in which secular speech would be allowed prevails."
 
 
 74
 Id. at 1478 (citations omitted) (emphasis added). We likewise emphasized the importance of equal access for religious speech in Lubavitch Chabad House, Inc. v. City of Chicago, 917 F.2d 341 (7th Cir.1990). We rejected Lubavitch's argument that the City of Chicago's content-neutral regulations prohibiting all free-standing structures in public areas at O'Hare International Airport were overbroad (the opinion distinguished leased spaces from public areas). But we were careful to point out that Lubavitch's free-standing Menorahs could not be excluded if other free-standing structures were permitted:
 
 
 75
 "First Amendment jurisprudence certainly does mandate that if the government opens a public forum to allow some groups to erect communicative structures, it cannot deny equal access to others because of religious considerations, Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), but the record is clear that the City has prohibited all groups from erecting structures in the airport public areas."
 
 
 76
 Id. at 347 (emphasis added). We are unpersuaded that whatever relationship the City of Ottawa may have had with the paintings in the past requires us to deviate from the equal access principles enunciated in Widmar, Mergens, Crestwood and Lubavitch.
 
 IV. NARROWLY TAILORED REMEDY
 
 77
 In permanently enjoining the display of the paintings "by any group," the district court failed to consider whether the total ban was narrowly tailored to remedy the "evil" of the City's alleged endorsement of the message of the paintings.
 
 
 78
 "A statute [or remedy] is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy. City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 808-810, 104 S.Ct. 2118, 2130-2132, 80 L.Ed.2d 772 (1984). A complete ban can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil. For example, in Taxpayers for Vincent we upheld an ordinance that banned all signs on public property because the interest supporting the regulation, an aesthetic interest in avoiding visual clutter and blight, rendered each sign an evil. Complete prohibition was necessary because 'the substantive evil--visual blight--[was] not merely a possible byproduct of the activity, but [was] created by the medium of expression itself.' Id., at 810, 104 S.Ct., at 2131."
 
 
 79
 Frisby v. Schultz, 487 U.S. 474, 485-86, 108 S.Ct. 2495, 2503, 101 L.Ed.2d 420 (1988). As we demonstrated above, the government (including federal courts) may not view private religious speech in a public forum removed from the seat of government to be evil because of its status as religious speech. Cf. Mergens, 110 S.Ct. at 2371. Thus, the only redressable "evil" that can arise from the display of religious symbols in a quintessential public forum is a perception that the government, through conduct other than merely tolerating the presence of the religious speech, has endorsed the speech or made the display of the symbols its own in a manner that violates the Establishment Clause. Because the First Amendment mandates that the government permit religious speech in quintessential public forums, the mere presence of religious symbols in such a forum cannot violate the Constitution. Yet, the district court's remedy was directed only at prohibiting the City from allowing the display of the paintings in Washington Park rather than at the conduct of the City that the district court evidently found to be demonstrative of an endorsement of the display. The district court's order was not narrowly tailored because it sought to eliminate the display of the paintings "by any party" instead of limiting it to the "evil" of the City's alleged endorsement of the paintings alone.
 
 
 80
 The district judge's permanent injunction prohibiting the display of the paintings implies that once the government impermissibly endorses religious speech (e.g. the paintings), that particular speech becomes poisoned and no private party may thereafter express that view.[7] The court evidently believed that the alleged endorsement of the City could not be remedied without a complete ban on the display, but that is an incorrect assumption. This court has previously recognized that the government can take steps to remove indicia of endorsement of private religious speech. See Mather v. Village of Mundelein, 864 F.2d 1291, 1292 (7th Cir.1989) (Village's addition of secular symbols to its own existing display of a creche on public property sufficient to avoid appearance of impropriety). Other courts have likewise recognized the ability of government to disassociate itself from private expression that might otherwise have been attributed to it. See American Civil Liberties Union v. Wilkinson, 895 F.2d 1098 (6th Cir.1990) (conditions ordered by district court adequate to avoid impression of state endorsement of religious message inherent in a creche); McCreary v. Stone, 739 F.2d 716 (2d Cir.1984), aff'd by an equally divided Court sub nom. Board of Trustees v. McCreary, 471 U.S. 83, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985) (remand for determination of size of sign necessary to disassociate the City from a free-standing creche in a public park). If the district court found the conduct of the City violative of the Establishment Clause, it should have ordered a remedy that would have directly addressed the violation. For example, if the City Council's resolution endorsing the "activities" of the Jaycees constituted an endorsement of the paintings, the court should have ordered a rescission of the resolution;[8] if the mayor's comments expressing approval of the paintings were inappropriate, the court could have enjoined further such statements or even required a retraction; if the court felt that the very presence of the paintings in the park provided evidence of an endorsement, it could have ordered the City to post a more visible sign of its own specifically disclaiming any association with the paintings. The district court could have fashioned any number of remedies that would have removed the City's alleged endorsement without infringing on the rights of private parties to engage in religious expression in Washington Park; instead, it placed an impermissible burden on free speech, which must be removed.
 
 
 81
 This court is agreed that the City should not engage in any conduct that approves or disapproves of the religious beliefs of anyone. The City must treat all who wish to engage in expressive activities within the confines of the law in Washington Park (and other public forums) equally.[9] In view of the controversy engendered by the display of these paintings, we think the Ottawa City Council would be well-advised to carefully avoid any type of conduct that could be interpreted as an endorsement of the religious message of the paintings.[10] If the mayor or any City Council member or official of the City wishes to express an opinion of a private party's exhibit, the person should clarify whether he or she is speaking in an individual or official capacity.
 
 
 82
 Permitting the OFA or the Jaycees to display the paintings in Washington Park complies with the concerns of the Establishment Clause as well as the Free Speech Clause. In the physical context of an exhibit on governmental property in the seat of government where "any [private] display located there fairly may be understood to express views that receive the support and endorsement of the government," County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter, 492 U.S. 573, 109 S.Ct. 3086, 3104 n. 50, 106 L.Ed.2d 472 (1989), the Establishment Clause may require the removal of such religious display if there is no other narrowly-tailored manner of avoiding the appearance of governmental endorsement of the message. But in a quintessential public forum removed from the seat of government, entering an injunction directed only at prohibiting the governmental conduct that provides indicia of endorsement is a narrowly-tailored manner of satisfying the concerns of the Establishment Clause, while allowing the private speaker to continue to express religious views avoids infringing on the liberties guaranteed under the Free Speech Clause. Hence, there is no conflict between the Establishment Clause and the Free Speech Clause when private persons engage in religious speech in a public forum.[11]
 
 V. CONCLUSION
 
 83
 We hold that the district court erred in issuing an overbroad injunction mandating that the City must remove the paintings from the park and "forego any future display of the paintings in the Park by any group" because the overbroad injunction was a content-based exclusion of speech without a compelling state interest to support it. We further hold that the court erred in enjoining the display of the paintings as opposed to enjoining only the conduct of the City that allegedly violated the Establishment Clause. The judgment of the district court is REVERSED except for the holding that the City of Ottawa violated the Establishment Clause. Since the City of Ottawa has not joined in appealing that holding, we express no opinion as to whether the City violated the Establishment Clause. Should the plaintiff wish to pursue her original intent of enforcing the regulation of private speech in Washington Park, it will be necessary for her to apply to the district court for a limited injunction consistent with the language in this majority opinion. The injunction against the City is VACATED and the case is remanded to the district court pursuant to Circuit Rule 36.
 
 
 84
 CUDAHY, Circuit Judge, concurring in the judgment.
 
 
 85
 In his amended complaint of January 11, 1989, Richard J. Rohrer, the original plaintiff in this case, sought a permanent injunction prohibiting the defendants from allowing the display of the paintings so long as they did not impose limits on the frequency or duration of the display. The distinguished district judge went far beyond the relief requested and ordered the City of Ottawa to have the paintings removed and to forego any future display of the paintings. He opined that "the unmistakably religious content of the paintings as a group moots any time-and-manner restriction as a saving device." Doe v. Small, 726 F.Supp. 713, 725 n. 23 (1989). I agree without reservation with the majority in vacating this draconian grant of relief and in partially reversing the grant of summary judgment that underlies it.
 
 
 86
 The action of the district court was apparently rooted in the belief that the Ottawa Jaycees, a private organization, was an alter ego or agent of the City and indistinguishable from it for purposes of the Establishment Clause. See 726 F.Supp. at 717-18 n. 14 (statements of the Jaycees and the City may be attributed to each other because the Jaycees are participants in state action). I suppose that under some circumstances such a symbiotic relationship could be found to exist and a private organization subsumed under a public body for Establishment Clause purposes. But there was no such finding here and the paramount importance of the Free Exercise and Free Speech Clauses is such that only the most clear and convincing evidence could justify such a finding (which would in effect deprive the private organization of its First Amendment liberties). It seems to me unlikely that such a finding could emerge from a summary judgment.
 
 
 87
 To the extent that the district court did not rely on an assumption that the Jaycees were speaking for the City, it assumed that these paintings, posted prominently in a public park, are like a creche in the middle of a county courthouse. At 722-24 & 724 (comparing the display to the creche banned in County of Allegheny v. ACLU, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989)). The court opined that "it makes no difference to the analysis or result that Washington Park may be a public forum." 726 F.Supp. at 724. But this is precisely the distinction that does matter. For even in Allegheny, the county was only forbidden to allow the creche to remain in that particular spot. Id. at 597, 109 S.Ct. at 3103 (opinion of Blackmun, J.) & 598, 109 S.Ct. at 3103 (opinion of the Court). The remedy for an Establishment Clause violation, however we choose to define it, must be bounded by the rights of the parties involved. In Allegheny, the county could exclude any speaker from the Grand Staircase and could appropriately be ordered to do so. Id. at 600 n. 50, 109 S.Ct. at 3104 n. 50 (Grand Staircase of court building is not a public forum). Here, the City is constitutionally required to maintain open access to Washington Park, a quintessential public forum, and therefore should not be ordered to deny such access to anyone.
 
 
 88
 There has, of course, been a relationship between the City of Ottawa and the display of the paintings for many years. For several years in the Sixties, the City itself displayed the paintings. Later the mayor apparently sought a suitable custodian for the paintings, and various mayors said nice things about the paintings or their display and might, under some theories, be said to have "endorsed" the display. The analysis of those various mayoral comments seems to raise, inter alia, the difficult question whether a high public official's mere commendation of a religious activity or event--the sort of commendation which I would guess is routine and frequent in the daily practice of municipal government and politics--violates the Establishment Clause.
 
 
 89
 In addition, there was the resolution of the City Council "endorsing" the Jaycees' activities. This might be seen as a clear violation of the Establishment Clause, but it too must be scrutinized for purposes of determining the present perception of the paintings. The majority opinion raises and disposes of the argument that past acts of endorsement by the City may "poison" the paintings and their display. There can be a "taint" to the extent that past acts may affect present perceptions. But we must bear in mind that it is present perceptions which are relevant to the question of a present violation of the Establishment Clause and the need for present injunctive relief.
 
 
 90
 As the majority has provided, this case must be remanded to the district court for further proceedings. Such a remand is clearly required because the City of Ottawa has been found to have violated the Establishment Clause and that determination of liability has not been appealed. The plaintiff is entitled to appropriate relief against the City even though the injunction running in effect against the Jaycees and the Ottawa Freedom Association (OFA) must be dissolved.
 
 
 91
 The majority has also made several constructive suggestions for more appropriate relief: rescission of the council resolution, retraction of the mayor's statements, a larger sign posted by the City, a guarantee of equal access to the concrete foundations and a content-neutral time limit on the display. Supra at 621-22. But the majority has also decided to forego any detailed or binding discussion of these issues. I think that the district court and the parties deserve more assistance from us.
 
 
 92
 The majority's reluctance is partly due to its determination that, as an intervenor, OFA has no standing to appeal from the finding that Ottawa violated the Establishment Clause. But even if OFA may appeal "only to the extent of the interest that made it possible for [it] to intervene," 7C Charles A. Wright, & M. Kane, et al., Federal Practice and Procedure § 1923 at 517 (2d ed. 1986) (citing cases), some forms of relief will surely affect its interest in displaying the pictures. As I have noted, the plaintiff has asked only for time and manner restrictions on the display of the paintings. The district court allowed the Jaycees to intervene as of right precisely because this kind of relief would affect their interests. Memorandum Opinion and Order at 3, 1988 WL 151240 (Dec. 14, 1988). Even if we may not address those forms of relief that run only against the town--rescission of the resolution, posting a sign and the like--the restrictions for which the plaintiff asked are still before us.
 
 
 93
 The other reason the majority has declined to discuss appropriate remedies is that several members of this court believe that Ottawa did not, in fact, violate the Establishment Clause. They would prefer to avoid a discussion that will lend weight to a constitutional theory with which they disagree and significance to facts they find innocuous. I do not think, however, that we are at liberty to anticipate the Supreme Court's forthcoming decision in Lee v. Weisman, No. 90-1014, when the Court's decision will have no impact on future proceedings in the district court: no matter what the Court decides, Ottawa's violation of the Establishment Clause will still be res judicata, and Doe will still be entitled to relief. I apply the law that is--Justice O'Connor's endorsement test as expressed in Lynch v. Donnelly, 465 U.S. 668, 687-94, 104 S.Ct. 1355, 1366-70, 79 L.Ed.2d 604 (1984) and adopted in Allegheny, 492 U.S. at 592-94, 109 S.Ct. at 3100-01 (opinion of the Court)--and evaluate the appropriateness of relief in those terms.
 
 
 94
 Settling on a constitutional doctrine does not solve every problem, however. Since OFA has no standing to challenge the existence of an Establishment Clause violation, I have no basis to identify which, if any, of the undisputed facts in this case constitute an Establishment Clause violation. But clearly one of the problems is that a large display erected on public property for long periods every year may easily appear to be endorsed by the local government, no matter what the government's intent. The City's permission to mount such a display may readily have the effect of endorsing a particular religious message and thus "sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." Lynch, 465 U.S. at 688, 104 S.Ct. at 1367 (O'Connor, J., concurring).
 
 
 95
 It is strange that a government can violate the Establishment Clause by tolerating free speech. And there is a danger that an effects test may enable the sort of heckler's veto of which Judge Easterbrook writes so eloquently. Infra at 630. But imagine that the City of Ottawa, inhabited primarily by Christians, allowed anyone to install a loudspeaker system throughout Washington Park over which any messages could be played. If a Christian church took up this fine offer and used its loudspeakers to broadcast sermons and gospel music all day long, could we really say that a reasonable observer wandering through the park should not believe that the City somehow endorses the message? At some point, as the Supreme Court recognized in Widmar v. Vincent, 454 U.S. 263, 275, 102 S.Ct. 269, 277, 70 L.Ed.2d 440 (1981), a private religious group may so dominate a public forum that a formal policy of equal access degenerates into endorsement. Indeed, one can see how this hypothetical might violate the Establishment Clause even under the coercion test that the Supreme Court may adopt in Lee v. Weisman: surely the City cannot allow a religious group to turn a public park into an enormous outdoor church. See Allegheny, 492 U.S. at 661, 109 S.Ct. at 3137 (Kennedy, J., dissenting) ("Symbolic recognition or accommodation of religious faith may violate the [Establishment] Clause in an extreme case. I doubt not, for example, that the Clause forbids a city to permit the permanent erection of a large Latin cross on the roof of city hall.").
 
 
 96
 As an initial matter, the facts of this case may or may not make it an example of the sort of domination of a forum that constitutes a violation of the Establishment Clause. If the size, duration and regularity of the display do not constitute domination by themselves, the City's official expressions of approval may have contributed to an impression, at least on the behalf of some citizens, that Ottawa has purposefully given over a corner of Washington Park to Christianity. Like the majority, I do not reach these questions. But it is clear that some reasonable restrictions on the display of the pictures would help to dispel whatever effect of endorsement exists.
 
 
 97
 At oral argument, counsel for OFA conceded that Ottawa could impose reasonable, content-neutral restrictions on displays in Washington Park. Regulations on all private displays might well help to dispel any impression that Ottawa is pleased to permit OFA to expropriate public space for its purposes. In this sense, the existence of regulations may be as important as their content. As to the content, the majority has suggested that the pictures be limited to the duration of Ottawa's own Festival of Lights. This seems reasonable, so long as the pictures are thought of as a Christmas display. But only cursory knowledge of Christian theology is required to know that these paintings would be as appropriate for Easter as for Christmas. OFA's right to pronounce its religious message should not depend on the season; a content-neutral regulation should treat the paintings as blank pages on which any message may be written. No private display should ordinarily be allowed to stand for more than a month or two per year. This approach would have the added advantage of avoiding any identification that may occur when an observer sees that Ottawa's and OFA's presentations go up and come down at the same time.
 
 
 98
 The problem with a content-neutral regulation of the sort I suggest is that it may be unnecessarily overbroad. There are any number of messages that private groups could deliver in Washington Park that Ottawa might be pleased to endorse. May Ottawa not permit a permanent exhibit in Washington Park that urges its citizens to protect bald eagles? The Constitution may forbid Ottawa to turn Washington Park into an outdoor church, but surely there is no constitutional restriction on turning it into a bird sanctuary.
 
 
 99
 Although there are Free Exercise and Free Speech concerns to be weighed in the balance, I believe that a regulation on displays may constitutionally be limited to religious displays. So long as there is an ample but reasonable opportunity for religious speech to take place, I see no reason why the government may not impose restrictions applying only to religious speech in order to avoid the appearance of endorsement.
 
 
 100
 This proposition follows from traditional Free Speech principles. Content-based regulations must be "necessary to serve a compelling state interest and [ ] narrowly drawn to achieve that end." Widmar, 454 U.S. at 270, 102 S.Ct. at 274 (citing Carey v. Brown, 447 U.S. 455, 461, 464-65, 100 S.Ct. 2286, 2292-93, 65 L.Ed.2d 263 (1980)). But compliance with the Establishment Clause is a compelling state interest, id., 454 U.S. at 271, 102 S.Ct. at 275, and restrictions on religious displays need be no more onerous than the Establishment Clause requires. Indeed, the Supreme Court appears to have applied this principle in Board of Education v. Mergens, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990). In that case, the Court upheld the constitutionality of a statute that requires secondary schools to give religious clubs the same access to school facilities that is provided to other student clubs. Id. at 252, 110 S.Ct. at 2373 (plurality opinion). According to six members of the Court, however, one of the saving graces of the statute was the restriction it places on official participation in these religious clubs. Unlike other student groups, religious groups may not have faculty advisors, nor may school staff participate in their meetings in other than a purely custodial role. Id. at 251, 110 S.Ct. at 2372 (plurality opinion)[1]; id. at 269-70, 110 S.Ct. at 2382-83 (Marshall, J., concurring). In short, somewhat unequal treatment for private religious speech may not only be constitutionally permissible, it may be constitutionally required. If Ottawa wants to be more flexible about the possible uses of Washington Park, the one or two month per year restriction might be limited to religious displays.[2]
 
 
 101
 The case must be remanded to the district court, and that court must devise an appropriate injunction. The majority has specified that the case be returned to another district judge on remand. But it is not surprising that Judge Shadur had such a strong reaction to this case. The record indicates that the original plaintiff in this case, Richard Rohrer, was, in effect, ridden out of town on a rail for daring to complain about the City's conduct. Affidavit of Richard Rohrer (June 2, 1989). The present plaintiff has concealed her identity to avoid suffering the same treatment. Motion to Add a Plaintiff and to Proceed Anonymously (June 27, 1989). However much some citizens of Ottawa may disagree with the position that the plaintiffs have taken, however much they may think the plaintiffs annoying and overlitigious, the conduct of some of them has been deplorable. This dispute has concerned the display of paintings from the life of Jesus of Nazareth, who counseled his followers: "But if any one strikes you on the right cheek, turn to him the other also; and if anyone would sue you and take your coat, let him have your cloak as well; and if any one forces you to go one mile, go with him two miles." Matthew 5:39-41 (Revised Standard Version, 2d ed., 1971). One would think that those who support this display would be capable of more charity.
 
 
 102
 FLAUM, Circuit Judge, with whom BAUER, Chief Judge, and CUMMINGS, WOOD, Jr., and CUDAHY, Circuit Judges, join, concurring in the judgment.
 
 
 103
 I agree with the majority that the district court's injunctive remedy is overbroad, and that a remand for a more tailored remedy is appropriate. Admittedly, this case comes to us in an unusual procedural posture: the City has not appealed, yet we are asked to "remedy the remedy" imposed for its Establishment Clause violation because the Ottawa Freedom Association (OFA), whose interests are affected, has intervened on appeal. The majority, to its credit, has avoided becoming mired in this procedural thicket, limiting its analysis to those issues pertinent to the OFA. In so doing, however, I fear that it may have cut away too cleanly from this dispute's historical backdrop.
 
 
 104
 As an initial matter, I must point out my concern with the majority's references to the City's "alleged" endorsement of the paintings. See, e.g., op. at 617, 620, 621. We are not permitted to adopt this characterization; because the City did not appeal the district court's ruling that it had violated the Establishment Clause, we are required to treat the endorsement as a given, not an allegation. Although this point at first may seem incidental, it exemplifies my more fundamental disagreement with the majority's approach: While the majority reasons that it need "not address the issue of whether the City of Ottawa endorsed the Jaycees' religious speech" because the City has not appealed, op. at 617, in my view, our analysis cannot set aside the City's involvement with the display, for the finding of its history of endorsement bears on the determination of what, if any, restrictions the district court may place on the OFA's display of the paintings in Washington Park on remand.
 
 
 105
 As Justice O'Connor noted in County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter,
 
 
 106
 the "history and ubiquity" of a practice is relevant not because it creates an "artificial exception" from [the endorsement] test. On the contrary, the "history and ubiquity" of a practice is relevant because it provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion.
 
 
 107
 492 U.S. 573, 630, 109 S.Ct. 3086, 3121, 106 L.Ed.2d 472 (1989) (concurring opinion). Although the First Amendment principles delineated by the majority are correct as a theoretical matter, they do not reach the practical issue of how to factor in the City's past actions. And because in the present case we cannot write on a clean slate, and must confront the City's impermissible endorsement as an unchallenged finding, we are required to evaluate the First Amendment principles and potential remedies with that endorsement in mind.
 
 
 108
 The dilemma facing the district court on remand, then, is how to remedy a government entity's Establishment Clause violation without unduly infringing upon the free speech rights of private parties. The school desegregation cases may be instructive in addressing the present implications of yesterday's endorsement, and in putting matters in a historical perspective. In Board of Education of Oklahoma City v. Dowell, --- U.S. ----, 111 S.Ct. 630, 638, 112 L.Ed.2d 715 (1991), the Supreme Court explained that a State's dismantlement of a segregated public education system--that is, the achievement of a "unitary" system--is complete when the State terminates its policy of intentional discrimination, adopts race-neutral policies and practices, and eradicates, to the extent practicable, the vestiges of unlawful discrimination. More recently, in Freeman v. Pitts, --- U.S. ----, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992), the Court recognized that this "unitariness" concept helps define the scope of the district courts' authority over school districts previously found to have engaged in unlawful segregation. Id., 112 S.Ct. at 1443. A similar, albeit simplified, analysis might well be applied in fashioning a remedy for previous Establishment Clause violations.
 
 
 109
 As the majority correctly recognizes, a remedy "is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." Op. at 620 (quoting City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 808-10, 104 S.Ct. 2118, 2130-31, 80 L.Ed.2d 772, (1984)). Put another way, "the nature of the violation determines the scope of the remedy." Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). A remedy is justifiable "only insofar as it advances the ultimate objective of alleviating the initial constitutional violation." Freeman, 112 S.Ct. at 1445. Here, the initial violation--as found by the district court--was the City's endorsement of a religious message. 726 F.Supp. at 725. Given this, the remedy--a broad injunction prohibiting "future display of the paintings in the Park by any group"--exceeded permissible bounds. By forbidding all future display of the paintings by any private party, the district court's attempt to address the City's violation regrettably implemented an inappropriate restriction of its own, censoring private religious speech in a public forum.
 
 
 110
 Borrowing from the approach used in the school desegregation context, the district court could benefit from considering such issues as whether the City had terminated its policy of endorsement, adopted equal access policies or taken steps to ensure equal access in practice, and eradicated, to the extent practicable, any "vestiges" of the past endorsement that might remain. Cf. Dowell, 111 S.Ct. at 638. Of concern, of course, is that the remedy seek to eliminate any remnants of past endorsement by the government. The district court should, therefore, attempt to determine what, if any, vestiges of the City's previous First Amendment violations remain today. Indeed, it may find no traces, and conclude accordingly that no remedy is warranted. This approach would address the City's constitutional violation while, at the same time, paying heed to the free speech rights of private parties. At root, it is a means of providing some contours within which the district court can shape an appropriate remedy.
 
 
 111
 It also is critical to recognize that the totality of past circumstances--rather than each of the City's individual acts--determines whether the previous endorsement endures to the present day. The majority notes that several members of this Court believe the City's resolution "too old to currently constitute an endorsement." Op. at 621 n. 8. That may well be the case. But what must be considered is whether all of the City's actions, in their entirety, sufficiently impact present perceptions of the display so as to warrant remedial relief.
 
 
 112
 One example of how historical context can impact a remedial result is as follows. The district court, as Judge Cudahy's concurrence recognizes, sensed some sort of "symbiotic" relation between the City and the then-private party defendant, the Jaycees, see 726 F.Supp. at 717-18 n. 14, although it made no such explicit finding. The absence of such a finding rendered the scope of the all-inclusive prohibition overbroad. However, a "symbiotic" relationship--in which a private speaker merely serves as a "stand-in" for the public entity--can conceivably exist. In such a scenario, a government entity's history of involvement, and its "artificial" transfer of the mode of expression to a private party, might provide adequate grounds for a ban, even in a public forum.
 
 
 113
 As one commentator has recognized, albeit in the public school context:
 
 
 114
 [I]dentifying who initiates religious speech may be relevant to determining the remedy. A sufficient remedy for noncoercive endorsement of student-initiated groups would be to enjoin further sponsorship.... But when the school creates the student organization in the first place, or coerces students to attend, the presumptive remedy would be to enjoin the sponsored organization from meeting, just as we decertify sweetheart unions with improper company sponsorship.
 
 
 115
 Douglas Laycock, Equal Access and Moments of Silence: The Equal Status of Religious Speech by Private Speakers, 81 Nw.U.L.Rev. 1, 53-54 (1986). In these cases, the line between public and private speech becomes murky, and the speech at issue is not altogether "private." Unfortunately, the majority's analysis does not permit such a possibility, even in the abstract, stating only the general rule that a difference exists "between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." Op. at 617 (quoting Board of Educ. of Westside Community Schs. v. Mergens, 496 U.S. 226, 250, 110 S.Ct. 2356, 2371, 110 L.Ed.2d 191 (1990)) (emphasis in original). I suggest the majority's approach is too restrictive, and fails to allow for even the possibility of a mixed public/private message and messenger.
 
 
 116
 Similarly, the majority cites Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), for the proposition that the First Amendment prohibits the state from denying religious organizations equal access to facilities that are open to nonreligious groups, op. at 618, and states, "we fail to comprehend how the Establishment Clause could constitute a sufficiently compelling state interest to justify a content-based exclusion of private religious speech in a quintessential public forum." Id. Here, however, the district court found that the display had so dominated the open forum as to call into question whether access truly was "equal." See 726 F.Supp. at 724 ("[u]nlike Widmar, here there is unrefuted empirical evidence" that the religious display dominated the Park) (citing Widmar, 454 U.S. at 275, 102 S.Ct. at 277). By framing the issue as it does, the majority avoids addressing this aspect of equal access analysis. See also Mergens, 496 U.S. at 252, 110 S.Ct. at 2373 (Equal Access Act, facially and as applied to school, does not have primary effect of advancing religion, "[a]t least in the absence of empirical evidence that religious groups will dominate ...") (quoting Widmar, 454 U.S. at 275, 102 S.Ct. at 277). The majority likewise states that the issue is "[w]hether private persons may be enjoined from engaging in religious speech in a public forum on the basis of the religious content of the speech." Op. at 617. It then embarks upon a lengthy and reasoned exposition of First Amendment public forum jurisprudence which, again, is fine in the abstract but is untethered to the historical context of this dispute--and therefore does not adequately guide our analysis of the remedial issue challenged by the OFA on appeal.
 
 
 117
 I do not question that religious speech, as an original matter, clearly is entitled to the same degree of First Amendment protection as private speech. Nor do I dispute that "the mere presence of religious symbols in a public forum does not violate the Establishment Clause." Op. at 619 (citing Mergens, 496 U.S. at 250, 110 S.Ct. at 2371). Our analysis, however, cannot rest solely on these broad general principles. We must acknowledge the district court's finding that the Establishment Clause was violated--even if we may individually disagree with that determination--and the fact that the City did not appeal that finding. In reviewing the overbroad nature of the injunctive remedy, this Court must at a minimum recognize the relevant historical context, in order to provide a framework within which the district court may construct an appropriate remedy.
 
 
 118
 EASTERBROOK, Circuit Judge, concurring.
 
 
 119
 The first amendment, applied here via the fourteenth, establishes several fundamental rules, including:
 
 
 120
 Rule 1: Government may not discriminate against private speech in a public forum on account of the speaker's views. The Free Exercise Clause assures speakers whose message is religious no less access to public forums than that afforded speakers whose message is secular or sacrilegious. Board of Education v. Mergens, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990); Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); Doe v. Village of Crestwood, 917 F.2d 1476, 1478 (7th Cir.1990).
 
 
 121
 Rule 2: Government may not support a particular religious group or point of view. (Whether endorsement standing alone violates the Establishment Clause, or whether instead the Constitution proscribes only use of the power of government in support of religion, is before the Supreme Court in Lee v. Weisman, argued Nov. 6, 1991.)
 
 The district court added:
 
 122
 Rule 3: If the government violates Rule 2, it must violate Rule 1 as a cure.
 
 
 123
 I join the court's opinion, which holds that the Constitution neither creates nor tolerates Rule 3. It cannot be that private religious speech, if ever preferred by the government in violation of Rule 2, is thereafter proscribed in violation of Rule 1--that speech the government dislikes is untouchable, while the Constitution turns off all music to the mayor's ears. The Constitution insulates private speech from the government's druthers. Neither official disfavor nor the rebound effect of official approbation can make a difference when the Constitution puts choice in private hands. A blunder by public officials cannot restrict the scope of private speech.
 
 
 124
 This necessarily entails the conclusion that religious speech may not be excluded from public forums just because passersby misunderstand the public role. See McCreary v. Stone, 739 F.2d 716 (2d Cir.1984) (private group may display creche in public park although government could not put up an identical display), affirmed by an equally divided Court under the name Scarsdale v. McCreary, 471 U.S. 83, 105 S.Ct. 1859, 85 L.Ed.2d 63 (1985); Crestwood (private group may sponsor a mass in a public park, though government may not); O'Hair v. Andrus, 613 F.2d 931 (D.C.Cir.1979) (same); Allen v. Morton, 495 F.2d 65 (D.C.Cir.1973) (same). Mergens, Widmar, and Fowler v. Rhode Island, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953), require no less. That a public forum may be close to city hall cannot matter; any forum open to secular speech must be open to religious speech. A government's obligation to dissipate any mistaken impression of sponsorship that it has induced is its own burden, and laxity in discharge of public duties is no justification for curtailing private speech.
 
 
 125
 Contrary views, expressed in cases such as Americans United for Separation of Church and State v. Grand Rapids, No. 90-2337 (6th Cir. Apr. 21, 1992); Smith v. County of Albemarle, 895 F.2d 953 (4th Cir.1990); and Kaplan v. Burlington, 891 F.2d 1024 (2d Cir.1989), create an obtuse observer's veto, parallel to a heckler's veto over unwelcome political speech. An obtuse observer will not appreciate that the Constitution requires the government to tolerate all kinds of speech in public places and so will infer that the government endorses what it does not forbid. Private errors do not justify public discrimination against speech. Otherwise some persons' failure to understand the meaning of the first amendment (that the government must remain neutral) would become an occasion for curtailing the scope of that amendment. Public belief that the government is partial would compel the government to become partial. The Free Exercise Clause offers special protection for religious speech. If hecklers cannot silence political speech in a public forum, obtuse observers cannot silence religious speech in a public forum.
 
 
 
 *
 Judge Wood, Jr. assumed senior status on January 16, 1992, after the hearing of this case on December 19, 1991
 
 
 [1]
 This suit was initially filed against the Mayor, members of the City Council and the City of Ottawa, Illinois by one Richard Rohrer. Jane Doe was substituted for Rohrer after he lost standing by moving away from Ottawa, and the Ottawa Jaycees intervened as defendants, since their practice of displaying the paintings made them the real party in interest. The Ottawa Jaycees pursued the original appeal of the district court's judgment, but after the panel's May 28, 1991 affirmance of the district court, the Jaycees transferred the paintings to the OFA, and at this time the OFA was substituted as intervenor-defendant-appellant
 
 
 [2]
 Where the record is capable of supporting differing interpretations of the facts, we shall view them in the light most favorable to the appellants: "In reviewing a grant of summary judgment, we must view the record and all inferences drawn therefrom in the light most favorable to the party opposing the motion. See United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)." Beard v. Whitley County, REMC, 840 F.2d 405, 409 (7th Cir.1988)
 
 
 [3]
 Over the years since 1980 when the Jaycees began displaying the paintings, they occupied a space on the west side of Washington Park on an average of two months per year. In 1988, the last year the paintings were displayed, they were up for thirty-five days. The longest period of time that the paintings were exhibited was in 1986, when they were on display for three and one-half months. The Jaycees' explanation for the extended period of time that particular year was that the metal poles supporting the paintings were frozen into the metal sleeves in the ground, thus making it impossible to remove the paintings until the ground thawed. The Jaycees ensured that the problem would not reoccur by replacing the original dilapidated supports with new concrete foundations with metal sleeves for the paintings (at the Jaycees' expense) the following year. The Jaycees designed the new supports and installed them in locations approved by the City Engineer and City Commissioner of Public Improvement. According to the mayor's deposition testimony, such approval for digging in the Park is necessary to avoid interfering with utility services such as gas, electric, telephone or water
 
 
 [4]
 The lawsuit is being prosecuted by the American Civil Liberties Union, so it does not appear that the plaintiff or the City of Ottawa has expended their own funds in this lawsuit
 
 
 [5]
 Justice O'Connor's "endorsement" test, initially articulated in her concurrence in Lynch v. Donnelly, 465 U.S. 668, 687, 104 S.Ct. 1355, 1366, 79 L.Ed.2d 604 (1984), prohibits the government from endorsing or favoring any particular religious expression or belief. This question concerning the Establishment Clause and whether the "endorsement" test Justice O'Connor expressed is proper is currently before the Supreme Court in Lee v. Weisman, --- U.S. ----, 111 S.Ct. 1305, 113 L.Ed.2d 240 (1991). Although we discuss the City's alleged "endorsement" of the paintings throughout this opinion, we take no position on whether that is the correct test because the issue is not before us
 
 
 [6]
 The Court reaffirmed its holding that allowing religious organizations to have access even in a limited public forum does not violate the Establishment Clause in Mergens, 110 S.Ct. at 2370-72. In Mergens, the Supreme Court rejected the argument that the equal access act, 98 Stat. 1302, 20 U.S.C. §§ 4071-4074, which requires high schools to provide equal access to religious student groups along with other student groups for the use of school facilities, violated the Establishment Clause
 
 
 [7]
 At the en banc oral argument, the ACLU attorney admitted that the Constitution prohibits viewing governmental endorsement of private speech as permanently poisoning it, but denied that the district court's injunction implied otherwise. We are unable to understand how the district court could permanently enjoin the display of the paintings "by any group" unless the court found the paintings to be eternally poisoned by the government's alleged endorsement
 
 
 [8]
 Several members of the court, including the author of this opinion, believe the resolution too old to currently constitute an endorsement regardless of its wording
 
 
 [9]
 To the extent the concrete foundations for the paintings might be viewed as an impermissible governmental endorsement of the paintings, we note that the record is void of evidence suggesting that the City would have denied permission to any other group or person to use the supports or install their own. If there were such evidence, the proper remedy would be to order the City to either allow the installation of the additional supports or remove the existing supports in order to provide for equal treatment of all protected speech. As noted above (see n. 3), the City's minor participation in determining the location of the Jaycees' supports was necessary to avoid risking interference with underground utility lines
 
 
 [10]
 That is not to say that it would be impermissible for the City to include religious symbols of its own in a Christmas display. See Mather, 864 F.2d at 1293
 
 
 [11]
 If the City wishes to regulate speech in Washington Park, a content-neutral regulation would permit the paintings to be exhibited the same length of time as the rest of the Christmas displays, but not a time period of greater or lesser duration
 
 
 [1]
 The Court might have justified these restrictions by referring to the potential vulnerability of immature adolescents, but it did not. Instead, the plurality emphasized the maturity of secondary school students and their ability to distinguish government endorsement from mere accommodation of private speech. Id. at 250, 110 S.Ct. at 2371
 
 
 [2]
 I do not think that allowing Ottawa to distinguish between religious and secular speech fosters excessive entanglement with religion. Every Establishment Clause case requires a court to make the same distinction. To avoid litigation, governments must already decide what sorts of speech implicate Establishment Clause concerns