Martin DEBOER, et al., Plaintiffs,

v.

VILLAGE OF OAK PARK, an Illinois municipal corporation, et al., Defendants.

No. 98 C 2437.

United States District Court, N.D. Illinois, Eastern Division.

Feb. 18, 1999.

James A. Davids, Kevin J. Todd, Bruce J. Van Heukelem, Peter Paul Vander-Velde, Hoogendoorn, Talbot, Davids, Godfrey & Milligan, Chicago, IL, Steven T McFarland, Gregory S Baylor, Center for Law and Religious Freedom, Christian Legal Society, Annandale, VA, for Martin Deboer, Soo Ai Kudo, David Martin, Jeffrey Morris, Mary Newberg, James Reed, Gregory Saganich, plaintiffs.

John B. Murphey, Simone Marie Boutet, Rosenthal, Murphey, Coblentz & Janega, Chicago, IL, for Village of Oak Park, Barbara Furlong, Sandra Sokol, Village Bd. of Trustees, Bernard Abraham, Gus Kostopulos, Rick Kuner, Fred Pospisil, Alan Raphael, Joanne Trapani, defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge.

In this action, plaintiffs—all residents of the Village of Oak Park who are active participants in the National Day of Prayer ("NDP") meetings there—challenge Oak Park's "Village Hall Use Policy," claiming it violates the Free Speech Clause of the First Amendment. Before us now are the parties' cross-motions for summary judgment. For the reasons set forth below, we grant in part and deny in part both motions.

## I. Background

The Oak Park Village Hall consists of three levels. The ground floor and second floor of the building are commonly referred to as the "Village Hall" and include a number of conference rooms, access to which lies at the heart of the dispute in this case. Before 1995, the Village did not have a policy regulating public use of these conference rooms. Local groups were able to use them free of charge, as long as a majority of persons in attendance were residents of Oak Park and the room requested was available. A wide range of local civic and not-for-profit groups as well as a number of committees and private fraternal groups and organizations used the rooms. Over time, this usage created logistical difficulties—including problems of expense, custodial service, maintenance, and interference with day-to-day operations—for the Village.

On July 5, 1995, the President and Board of Trustees of the Village of Oak Park approved a policy regarding the use of the Village Hall ("Use Policy" or "Policy"). The Policy contained this section governing the use of the Village Hall by members of the public:

> The President and Board of Trustees may, on occasion, choose to sponsor, cosponsor, or make portions of the Village Hall ... available for public forums, events or activities.... Only public forums, events, or activities which conform with all of the following requirements may be considered for use of the Village Hall. The forum, event or activity must: (1) be open to all citizens of the Village; (2) have as its primary purpose providing a civic program or activity which benefits the public as a whole; (3) not be based on or must not promote or espouse the philosophy, ideas or beliefs of any particular group, entity or organization; (4) be sponsored or put on by a local not-for-profit group or organization based within the Village; (5) not be sponsored or put on by a group or organization that has sponsored or put on a

forum, event or activity in the Village Hall during the preceding twelve months, unless exceptional circumstances are involved; and (6) not be a fundraising event.

Two rooms have been made available for public use under this provision of the Policy: the Community Room and the Council Chambers. The administration of the Policy is the responsibility of the Office of the Village Clerk.

Congress declared an annual National Day of Prayer ("NDP") in 1952, in a joint resolution signed by President Truman. *See* 36 U.S.C. § 169h. In 1988, the declaration was amended and signed into law again by President Reagan, designating the first Thursday of every May as the National Day of Prayer. Proclamation No. 7088, 63 Fed.Reg. 24,383 (1988). Each year, including the years during which the Oak Park NDP Committee has sought access to the Village Hall, the President issues a proclamation encouraging all citizens to pray on that day. *See, e.g.,* Proclamation No. 6877, 61 Fed.Reg. 15,175 (1996). According to the plaintiffs in this case, the purpose of the NDP is for Americans to gather together to pray for the United States, the individual states and communities, and officials at all levels of government. They also claim that their meetings, including the annual NDP meeting they sponsor, are open to all residents of Oak Park, regardless of one's religion, denomination, belief or non-belief.

Martin DeBoer applied for and was granted permission to use a Village Hall room for the annual "National Day of Prayer" assemblies of 1993, 1994, and 1995. During this time—prior to the adoption of the Use Policy—Village Attorney Raymond Heise received Freedom of Information Act requests and inquiries from the American Civil Liberties Union, who was engaged in a review of the Village's policies and practices to determine whether or not permitting the National Day of Prayer meeting in the Village Hall constituted a violation of the First Amendment's Establishment Clause. In February 1996, DeBoer completed and submitted a "Public Notice of Meeting and Conference Room Sign-up Form" to the Village Clerk's Office on behalf of the Oak Park National Day of Prayer Committee, as he had in years past. The group wished to use the Village Hall for its annual National Day of Prayer Meeting on May 2, 1996. In the space on the form entitled "Agenda Items," DeBoer wrote: "Prayer for our community, and our local, state and national government leaders." Two months later, then-Village President Lawrence Christmas denied the request on the grounds that the proposed use was inconsistent with the Use Policy. DeBoer submitted another application in March of 1997, again requesting use of the Village Hall by the group for "prayer for community, state, national leaders." A few days later Christmas again denied the NDP group access for its event, in a letter identical—except for its dates—to that issued in 1996. In March 1998, DeBoer submitted an application listing the purpose of the proposed meeting as "prayer," and again a nearly identical letter was written—this time by the Village Clerk—denying the group authorization to conduct its event in the Village Hall. For the years 1996 through 1998, plaintiffs held the NDP meeting at the Oak Park Library, located a few blocks away. Unsatisfied with this, DeBoer sued the Village and its officials, alleging that the Use Policy and its application to the plaintiffs violated the First Amendment.

## II. Discussion

■■■ It is well-established that religious worship and discussion are forms of speech protected by the First Amendment. *See, e.g., Widmar v. Vincent,* 454 U.S. 263, 269, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); *Doe v. Small,* 964 F.2d 611, 617 (7th Cir. 1992) (en banc), and there is no significant distinction for First Amendment purposes between religious speech or discussion and religious "speech acts ... constituting 'worship'," *Widmar,* 454 U.S. at 270 fn. 6,

102 S.Ct. 269. It is also true, however, that "[e]ven protected speech is not equally permissible in all places and at all times." *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.,* 473 U.S. 788, 799, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). The Court has long recognized that the Government, like a private property owner, " 'has power to preserve the property under its control for the use to which it is lawfully dedicated.' " *Id.* at 800, 105 S.Ct. 3439 (quoting *Greer v. Spock,* 424 U.S. 828, 836, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976)). The Constitution does not require the Government to allow all those who wish to exercise their right to free speech to do so on any Government property irrespective of the nature of the property or the potential disruption posed by the speaker. *Id.* at 799–800, 105 S.Ct. 3439. Rather, the Government's interest in limiting the use of the property to its intended purpose is weighed against others' interests in using the property for different purposes.

### A. Classification of the Forum

■ The extent to which the Government may control access to its property depends on the nature of the property, so we must first classify the Village Hall as either a traditional public forum, a designated public forum, or a nonpublic forum. *See Cornelius,* 473 U.S. at 800, 105 S.Ct. 3439. The Government's right to limit expressive activity is most sharply circumscribed with respect to traditional or "quintessential" public fora—such as street and parks—which "have immemorially been held in trust for the use of the public," principally for purposes of assembly, debate, and the free exchange of ideas. *Id.* at 802, 105 S.Ct. 3439; *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Moving along the spectrum, a public forum may be created or "designated" by the Government when—by policy or by practice—it intentionally opens some property for "indiscriminate use by the general public" for discourse or expressive activity. *Perry,*

460 U.S. at 47, 103 S.Ct. 948. Here, too, speakers may not be excluded or restricted in the absence of a compelling governmental interest. *See id.* at 45–46, 103 S.Ct. 948; *Cornelius,* 473 U.S. at 800, 105 S.Ct. 3439. All other government fora are considered "nonpublic," property "not open to the general public although they are sites usable and sometimes used for discussion and other expressive activities." *Chicago Acorn, SEIU Local No. 880 v. Metropolitan Pier and Exposition Authority,* 150 F.3d 695, 700 (7th Cir.1998); *see also Grossbaum v. Indianapolis–Marion County Bldg. Authority,* 100 F.3d 1287, 1297 (7th Cir.1996) (*Grossbaum II* ) (citing *International Society for Krishna Consciousness v. Lee,* 505 U.S. 672, 678–79, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992)). The government has more control over nonpublic fora: it may curtail access to them so long as its restrictions are both reasonable and viewpoint-neutral. *See Cornelius,* 473 U.S. at 800, 806, 105 S.Ct. 3439.

■ In this case, no one argues that the Oak Park Village Hall is a traditional public forum like a public street or park; it is either a designated public forum or a nonpublic forum. In order to classify a forum into one of these latter two categories, courts examine a number of factors, most importantly the Government's intent in establishing the forum, as ascertained from the Government's policy and practice, as well as the nature of the property and its compatibility with expressive activity. *See Cornelius,* 473 U.S. at 802–03, 105 S.Ct. 3439.

■ With respect to the Oak Park Village Hall conference rooms, the adoption of the Use Policy demonstrates that the Board did not intend to open them to the general public for all proposed activities and events. Prior to 1995, the Village had no policy regarding the use of the rooms, and local groups had access to them on what essentially amounted to a first come first served basis. A wide range of

groups, committees and organizations utilized the facilities, and the Village eventually began experiencing operational problems as use of the Hall by the public grew. As Village Attorney Heise explained in his deposition, he and other Village employees and officials were forced on more than one occasion to vacate meeting rooms in which they had been working in order to honor the reservations of outside groups. Heise Dep. at 16–20. However, the Board wanted to make the building available to the public for civic activities, rather than shut it down to outsiders completely. *Id.* at 20. The new Policy, therefore, set forth a series of regulations governing use of the Village Hall by the public, opening it only to those public events that conform to its six enumerated requirements. This selective access granted to certain civic, charitable and non-profit organizations is not "indiscriminate" enough to convert the property into a public forum. *See Perry,* 460 U.S. at 47–48, 103 S.Ct. 948. For these reasons, we conclude that the Oak Park Village Hall is a nonpublic forum.

### B. Viewpoint Discrimination

Given that the Village Hall is a nonpublic forum, the Village's use restrictions will survive a constitutional challenge if they are both reasonable in light of the purposes served by the forum, *Rosenberger v. Rector & Visitors of Univ. of Virginia,* 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), and viewpoint-neutral. *See Grossbaum v. Indianapolis–Marion County Bldg. Authority,* 63 F.3d 581, 587 (7th Cir.1995) (*Grossbaum I* ). No one doubts that limiting the public's use of the Village Hall to programs or activities of a civic character is a reasonable content-based restriction that the Village Board is entitled to make.

Viewpoint neutrality, however, is a point of contention. The Government may not deny access to a speaker in order to suppress the perspective—including a religious perspective—he espouses on an "otherwise includible subject." *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439; *see also Grossbaum I,* 63 F.3d at 587. In one Supreme Court case, for example, the plaintiff's proposed film series dealt with subjects—child rearing and family values—from a religious point of view which were otherwise permissible under a school district's policy restricting its buildings to "social or civic purposes" only. *Lamb's Chapel v. Center Moriches Union Free School Dist.,* 508 U.S. 384, 393, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993). Other speakers were permitted to use the premises to discuss the same topics from a non-religious perspective, and the Court held that denying the plaintiff an opportunity to exhibit the film in the building after school hours "solely because the series dealt with the subject from a religious standpoint" was unconstitutional. *Id.* at 394, 113 S.Ct. 2141. More recently, the Court held that a state university could not deny funding to a student newspaper which featured articles "within the approved categor[ies] of publications" just because the articles expressed religious points of view. *Rosenberger,* 515 U.S. at 831, 115 S.Ct. 2510.

The Seventh Circuit has emphasized the need to scrutinize content-based discrimination very closely due to the elusive and manipulable nature of the line between viewpoints and subjects, warning that the classification of a particular perspective as a subject rather than a viewpoint on a subject may shield discrimination against that viewpoint. *See Grossbaum II,* 100 F.3d at 1298. We must therefore first determine whether the NDP event is a program that deals with civic subject matter from one particular (i.e.religious) perspective, or whether it falls into a separate category of religious subject matter, legitimately excluded from this nonpublic forum under the Use Policy.

The plaintiffs argue that the Village's use denial amounts to viewpoint-based discrimination. They contend that their proposed activity, "Prayer for our community, and our local, state and national government leaders," constitutes protected

speech on a civic matter, an appropriate subject for public discussion in the Village Hall according to the Use Policy. The Village argues that prayer cannot be equated with a discussion or debate from a religious viewpoint—that prayer about even civic matters concerns, by nature, an entirely different subject.

The Village relies primarily on *Bronx Household of Faith v. Community Sch. Dist. No. 10*, where the Second Circuit upheld regulations prohibiting religious worship services in a nonpublic forum, drawing a distinction between acts of worship and the discussion of secular matters from a religious viewpoint. 127 F.3d 207, 215 (2d Cir.1997). The court found such a contrast "not difficult for school authorities to make," stating that "religious services ... are not social, civic or recreational meetings or entertainments," for which use of the premises in question was permitted. *Id.* at 215. Judge Cabranes's concurrence in that case elaborated on the court's distinction, explaining that in his view, "there is no real secular analogue to religious 'services,' such that a ban on religious services might pose a substantial threat of viewpoint discrimination between religion and secularism." *Id.* at 221 (Cabranes, J., concurring). He continued:

> Because "services" are by definition religious in nature, it does not appear that they could ordinarily be understood to serve as a vehicle for both religious and secular viewpoints. I am therefore satisfied—while recognizing that the line between permissible "content" discrimination and impermissible "viewpoint"

discrimination "is not a precise one,"—that the District's ban on religious "services" ... is best described as a form of "content" discrimination that does not favor one viewpoint over another. *Id.*

■ Though we agree with the Second Circuit's reasoning, we decline to apply it here because of some important differences in this case. Had we been presented with the facts of *Bronx Household,* we would have reached the same conclusion. The plaintiffs in *Bronx Household* sought to conduct "church worship services," including "hymn singing, communion, Bible reading, Bible preaching and teaching" every Sunday. *Id.* at 215. The plaintiffs in this case, however, proposed only a one-time, one-hour "Prayer for our community, and our local, state and national government leaders"[1] in honor of the "National Day of Prayer," which was designated by Congress and is proclaimed each year by our President. While the Supreme Court observed that "[i]t is, in a sense, something of an understatement to speak of religious thought and discussion as just a viewpoint, as distinct from a comprehensive body of thought," and that "[r]eligion may be a vast area of inquiry," it acknowledged that religion "also provides, as it did here, a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." *Rosenberger,* 515 U.S. at 831, 115 S.Ct. 2510. Accordingly, even though a weekly worship service might be distinctly different from a discussion or debate about a secular subject from a religious perspective,[2] we see

1. DeBoer worded the description of the proposed event a little differently in each of the denied applications. In 1996 he used the above-quoted language in the space provided for "agenda items." In 1997 he wrote "prayer for community, state, national leaders," and on the 1998 application he wrote only "prayer." The NDP group's intention to engage in prayer for civic leaders is not disputed by the Village.

2. We take the plaintiffs' word that they intended to engage only in prayer for their community and government leaders. There is

some evidence in the record suggesting that National Day of Prayer services conducted in past years have included other types of prayer as well, *see, e.g.,* DeBoer Dep.Ex. 1, so the precise scope of the proposed NDP event is not entirely clear. However, the Village Clerk did not rely on that evidence in making the decision to deny NDP access to the Village Hall. Sokol Dep. at 144–45. The decision was based on the mere fact that the proposed expression was in the form of prayer, a fact of which the Village had knowledge from the face of NDP's application alone.

no meaningful distinction between an annual offering of prayer about our civic leaders and a discussion about our civic leaders from a religious viewpoint. The only difference is the packaging, as prayer is often addressed to some sort of deity and the language used is often more formal than the vernacular. A meeting at which attendees pray to God to guide our civic leaders to follow the commands of the Scriptures—like a meeting at which attendees discuss what God and the Scriptures command our civic leaders to do—consists at base of words spoken aloud, from a religious perspective, on what our civic leaders should do.

We therefore agree with the plaintiffs that their proposed event—as described in their applications—does fit within the Policy's civic content. Indeed, the Village itself defines "civic" as "hav[ing] something to do with the government and affairs of the Village of Oak Park," Village Resp. Mem. at 7; claims that the Hall is restricted to "matters where there is a 'nexus between a citizen and a governing body," *Id.* at 14; and adopts a dictionary's definition of "civic" as "of or pertaining to a city, citizenship or citizens." *Id.* at 17. Under these interpretations of "civic," we conclude that NDP's proposed activity fits within the content restrictions imposed by the Use Policy and that the Village's denial of access to its facilities was viewpoint discrimination in disguise.

▮ Plaintiffs next argue that the Policy's requirement that the proposed activity "not be based on or ... promote or espouse the philosophy, ideas or beliefs of any particular group, entity, or organization" has been applied to NDP in a viewpoint discriminatory manner, since other groups—such as the NAACP and the League of Women Voters—have been al-

lowed to conduct events that NDP claims were based on their respective philosophies. We need not reach this question, however, because we conclude that the requirement is unconstitutionally viewpoint-discriminatory on its face.

The Village goes to great lengths to argue that the requirement actually guarantees viewpoint neutrality. They defend it as "mak[ing] it crystal clear that any activity which falls within the subject matter of allowable uses will indeed accommodate all viewpoints." The purpose of the use criteria, it claims, was "to ensure that these rooms maintain an aura of complete neutrality." Village Attorney Heise explained that the problem with the NDP event was that it would "express a view ... a viewpoint that espouses prayer, and that is exactly what we are trying to avoid is [sic] espousing particular points of view." Heise Dep. at 46. Finally, the Village submitted as material the fact that in the years before the Use Policy was adopted—during which the plaintiffs were granted access to the Village Hall—Heise received Freedom of Information Act requests and other inquiries from the American Civil Liberties Union, who was reviewing the Village's policies and practices for compliance with the Establishment Clause. The Village's apparent concern—that allowing the plaintiffs to conduct activities in the forum that express a religious viewpoint will lead to an Establishment Clause violation—is not well-founded, nor is it a defense to a Free Speech Clause violation. The Supreme Court has held that "the guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." *Rosenber-*

---

If in fact the NDP agenda is more expansive than the plaintiffs' applications suggest, however, we think that it would be constitutional for the Village to prevent the group from meeting in the forum, since the proposed activity could no longer pass as "civic." By way of analogy, many Day of Atonement (Yom

Kippur) services held by American Jewish congregations include a prayer for the United States and its national, state, and local leaders. This prayer, however, lasting only a few minutes, does not transform the entire service into a civic affair.

*ger*, 515 U.S. at 839, 115 S.Ct. 2510. As in *Rosenberger*, there is no danger of an Establishment Clause violation here because there is no suggestion that the Village's opening its forum to the NDP would have the purpose of advancing religion or of aiding its cause, *Id.* at 840, 115 S.Ct. 2510, since NDP is only one of the many different groups that will be granted access to the Village Hall over the course of the year for the purpose of conducting a civic activity. In short, the Village's argument ignores the "critical difference 'between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect.'" *Id.* at 841, 115 S.Ct. 2510 (quoting *Board of Educ. of Westside Community Schools (Dist.66) v. Mergens*, 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990)).

■ More fundamentally, the viewpoint prong of the Policy has the constitutional standard precisely backwards; it undermines rather than promotes the principle of viewpoint neutrality required by the Constitution. Viewpoint "neutrality" does not mean that the government must ensure the internal neutrality of each event in its fora by mandating that no viewpoint or all viewpoints be expressed. Rather, it means that the government must be *indifferent* to the viewpoints of all speakers in its fora. *See id.* at 835–36, 115 S.Ct. 2510 ("granting the State the power to examine publications to determine whether or not they are based on some ultimate idea and if so for the State to classify them" threatens "[v]ital First Amendment speech principles"); *cf. Edwards v. Aguillard*, 482 U.S. 578, 586, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) ("[t]he [stated] goal of providing a more comprehensive science curriculum is not furthered either by outlawing the teaching of evolution or by requiring the teaching of creation science"). The restriction here smacks of government management of speech, and this contradicts the fundamental First Amendment viewpoint neutrality principles by which the Village claims to be abiding. If the Village's argument was correct, moreover, it would mean that every single policy regulating speech on government property must contain a clause prohibiting any activities based on, promoting, or espousing any idea, belief, or opinion of a particular group, entity, or organization, and we have not found any support for such a strange proposition.

## C. Unbridled Discretion

We now turn to the plaintiffs' claim that the Use Policy vests the Village Clerk with unbridled discretion in violation of the Free Speech Clause. We pause briefly to dispose of the Village's threshold claim that the plaintiffs do not have standing to bring a claim of unbridled discretion since they "seek[ ] to assert the rights of other unnamed parties who might be affected by the Policy." This argument ignores the Supreme Court's cases, which "have long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license," *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 755–56, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), and which state that "[a]n overbroad regulation may be subject to facial review and invalidation even though its application in the case under consideration may be constitutionally unobjectionable." *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 129, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992).

■ The question before us is whether the "civic program or activity that benefits the public as a whole" requirement is so broad as to enable implementing officials to covertly apply viewpoint-driven criteria. Rules governing speakers' access to a forum must contain "narrow, objective, and definite standards," *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 150–

51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), or else officials will possess unfettered discretion which threatens censorship and may operate as a prior restraint, destroying freedom of speech. *See Lakewood*, 486 U.S. at 757, 108 S.Ct. 2138; *see also Forsyth County*, 505 U.S. at 131, 112 S.Ct. 2395. However, as the Supreme Court has noted, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

The plaintiffs argue that the "civic program or activity" element is not consistently defined and applied by the Village Clerk, and that the "benefits the public as a whole" element requires the Village Clerk to assess the relative value of speech and to dispense benefits and burdens according to her assessment, a "constitutionally impermissible inquiry" under the Free Speech Clause. They analogize this case to *Shuttlesworth*, where the Court struck down a local ordinance directing government officials to grant parade or demonstration permits to applicants "unless in [their] judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require[d] that it be refused." *Shuttlesworth*, 394 U.S. at 149–50, 89 S.Ct. 935. The Court emphasized that the regulation was problematic because the officials, in making their decisions, would "be guided only by their own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience,'" and therefore they had "virtually unbridled and absolute power" to deny groups permission to parade. *Id.*

■ We believe that an official could relatively simply and in a viewpoint-neutral manner apply the "civic program or activity" part of the requirement (although as we explained in the previous section, it did not do so in this case). The definitions of "civic" provided by the various Village officials deposed were similar, all mentioning something about citizens, government, and the relationship between the two, and according to the dictionary, "civic" means "of, relating to, or belonging to a city, a citizen, or citizenship." Webster's II New Riverside University Dictionary 266 (1984). The Village's practices support this understanding of "civic," as access to the Village Hall has been granted to—among others— a candidates' forum for the 1995 school elections, a candidates' forum for Village elections, and Congressman Danny Davis' town hall meeting. Access was accordingly denied to—among others—the Oak Park–River Forest Symphony Orchestra, Ameritech, Toastmasters, the Oak Park Board of Realtors, and Dean Witter Investment Services.

■ The "benefits the public as a whole" criterion, on the other hand, cannot survive constitutional scrutiny. It is unclear to us what such a vague standard means. Must the event benefit every single member of the public, or just a majority of them? What types of activities would satisfy this requirement? For instance, would a debate between a number of Democratic primary election candidates be considered to benefit the public as a whole because its purpose is to provide information to voters about the political process and to educate them about the upcoming election? Or would such an activity be deemed to benefit only Democratic citizens and therefore rejected as not benefitting "the public as a whole"? While the "benefits the public as a whole" language in the Village Hall Use Policy does not contain the same terms as did the *Shuttlesworth* ordinance, it has the same amorphous quality.

Even the officials charged with implementing this standard seem unsure of its meaning. For example, when asked how she knows that a proposed event has as "its primary purpose benefitting the public as a whole," Village Clerk Sokol, the official responsible for approving applications, said:

Well, if I really knew the answer to that question, if there were an answer to that question, I'd be pretty special. One can only hope, which is a bad word to use I'm sure right now. But if it's giving information and educating the public, one might assume that it's benefitting the public as a whole if it is open to everyone.

Sokol Dep. at 50–51. If Sokol is correct, the clause is superfluous, since the very first prong of the Policy regarding use by the public requires that the event be open to all Oak Park citizens.[3] Village Attorney Heise testified that the intent behind this prong of the Policy was to allow only activities that appeal to the population generally, not just to a segment of the population. Heise Dep. at 46. This truism causes us to doubt seriously whether the language of this clause provides any helpful guidance to its implementing officials. Later, when pressed regarding what sorts of events would qualify as "benefit[ting] the public as a whole" under the policy, Village Attorney Heise answered: "Well, it has to be a civic activity that benefits the public generally," adding only that "[i]t has to be something related to government, a citizen's relationship with government." *Id.* at 55. This suggests to us, consistent with the argument in the Village's brief, that the Village uses the phrase "benefits the public as a whole" merely to explain what qualifies as "civic" under the Use Policy—in which case, again, the clause is at best superfluous. Because it could, however, be used by Village officials to exclude programs that express only one (perhaps unpopular) perspective on a civic matter, we strike the "benefits the public as a whole" clause of the Village Hall Use Policy as unconstitutional, and hereby enjoin the Oak Park Village Clerk from enforcing it.

### III. Conclusion

For the foregoing reasons, we grant in part and deny in part both the plaintiffs'

and defendants' motions for summary judgment. We emphasize that this case should be construed narrowly. A variance to the particular factual situation before us could very well implicate First Amendment considerations warranting a different result. Accordingly, the Oak Park Village Board may restrict the public's use of the Village Hall to civic programs or activities, but it may not exclude prayer about civic matters, nor require that such activities "benefit the public as a whole," nor forbid that the programs or activities "be based on or . . . promote or espouse the philosophy, ideas or beliefs of any particular group, entity, or organization." The National Day of Prayer group—provided that it meets the other elements of the Use Policy not examined in this opinion—should therefore be allowed to hold its annual meeting in the Village Hall, so long as it limits the agenda to civic matters, such as "prayer for our community, and our local, state and national government leaders."

It is so ordered.

---

3. Sokol also suggested that to "benefit the whole," an event would have to be "fair," with "all points . . . being shown," Sokol Dep. at 52, a requirement which we found to be viewpoint-discriminatory in the previous section of this opinion.