Martin DeBOER, et al., Plaintiffs,

v.

VILLAGE OF OAK PARK, an Illinois municipal corporation, et al., Defendants.

No. 98 C 2437.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 09, 1999.

**805**

James A. Davids, Kevin J. Todd, Bruce J. Van Heukelem, Peter Paul Vander-Velde, Hoogendoorn, Talbot, Davids, Godfrey & Milligan, Chicago, IL, Steven T. McFarland, Gregory S. Baylor, Center for Law and Religious Freedom, Christian Legal Society, Annandale, VA, for Martin DeBoer, Soo Ai Kudo, David Martin, Jeffrey Morris, Jr., Mary Newberg, James Reed, Gregory Saganich.

John B. Murphey, Simone Marie Boutet, Rosenthal, Murphey, Coblentz & Janega, Chicago, IL, for Village of Oak Park, Barbara Furlong, Sandra Sokol, Village Board of Trustees of Village of Oak Park, Bernard Abraham, Gus Kostopulos, Rick Kuner, Fred Pospisil, Alan Raphael, Joanne Trapani.

### MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge.

Before us now is the Village of Oak Park's Rule 60(b) motion for reconsideration of our February 18 opinion in this case. We held that the Village must allow the plaintiffs, members of a group that organizes the annual National Day of Prayer (NDP) celebration in Oak Park, to hold their event in the Village Hall, "so long as [they] limit[ ] the agenda to civic matters, such as 'prayer for our community, and our local, state and national government leaders.'" *DeBoer v. Village of Oak Park,* 53 F.Supp.2d 982, 992 (N.D.Ill. 1999) (DeBoer I) (quoting plaintiffs' application for use of the Village Hall). The Village Hall Use Policy allows access to its meeting rooms only for forums, events or activities that "have as [their] primary purpose providing a civic program or activity which benefits the public as a whole," and that are not "based on [n]or ... promote or espouse the philosophy, ideas or beliefs of any particular group, entity or organization." *Id.* at 984. We found the policy's limitation to civic activities to be a constitutional content-based restriction for a nonpublic forum such as the Village Hall. We focused our analysis, however, solely on whether the subject matter of the proposed prayer service was civic, and concluded that the Village could not deny the NDP access to the meeting rooms merely because they intended to conduct a prayer there, as such a restriction amounted to discrimination based on the religious viewpoint expressed—rather than the content of the expression—in violation of the First Amendment. *See id.* at 989. We also held

that the requirement that the proposed activity "benefit the public as a whole" was overbroad, and the requirement that the activity not be "based on or . . . promote or espouse the philosophy, ideas or beliefs of any particular group, entity or organization" was viewpoint-discriminatory, and thus declared both of the latter provisions facially unconstitutional. *See id.* at 989, 992.

Attached as an exhibit to the Village's motion for reconsideration is a transcript of the May 6, 1999, NDP event that was held in the Village Hall as a consequence of our ruling. The transcript reveals that while the ceremony included some readings and prayers about the welfare of government leaders, it also included a number of readings from the New Testament, hymn singing, a lengthy portion dedicated to "prayer for our churches," a song entitled "Shine, Jesus Shine," and a closing prayer focusing on the Christian Church. The Village asks us, pursuant to Federal Rule of Civil Procedure 60(b)(2), to reconsider our judgment since this "newly-discovered evidence" illustrates that the true nature of the NDP event is not civic, contrary to what this Court understood it to be due to the limited record before us at the time of our judgment.

## I. The Motion for Reconsideration

■ To grant Rule 60(b) relief on the grounds of newly-discovered evidence, we must find that: (1) the evidence existed at the time of summary judgment or concerns facts that were in existence at that time; (2) the evidence was discovered after the judgment was issued; (3) the Village showed due diligence to discover the evidence; (4) the evidence is admissible; (5) the evidence is credible; (6) the evidence is material to the issues considered; (7) the evidence is not merely cumulative or impeaching; and (8) the evidence is so significant that it is likely to change the outcome of the case. *See United States v. McGaughey,* 977 F.2d 1067, 1075 (7th Cir.1992). Focusing only on the four disputed factors, we find that the transcript does qualify as newly-discovered evidence.

■ The plaintiffs first argue that the transcript does not qualify as new evidence because it was created during and after the May 6, 1999, event and thus did not exist when the parties' cross-motions for summary judgment were considered and decided, in late 1998 and early 1999. We find that the transcript overcomes this hurdle, however, because even though the most recent NDP event took place post-judgment, the transcript is evidence of facts considered by this Court in making its decision. *See Peacock v. Bd. of Sch. Comm'rs,* 721 F.2d 210, 214 (7th Cir.1983) ("Material not in existence until after trial falls within 60(b)(2) only if it pertains to facts in existence at time of trial"). Whether the NDP services were "civic" in content was at the crux of the case, and the abridged nature of the record before us at the time dictated the outcome. *See DeBoer I,* 53 F.Supp.2d at 988 n. 2, 992 (holding was based on the limited agenda of the NDP event as it was represented in the plaintiffs' application to use the Village Hall, and "[a] variance to the particular factual situation before us could very well implicate First Amendment considerations warranting a different result").

■ Next, the plaintiffs argue that the failure to discover this evidence before we issued our ruling was caused by a lack of due diligence on the Village's part, since NDP events were held in the Village Hall from 1993 to 1995 and were held elsewhere in Oak Park once the Village adopted its Use Policy in 1995. We disagree. When the case began, the plaintiffs did not allege that the NDP event was a "civic activity" and as such was entitled to access to the Village Hall under the Use Policy. Rather, they alleged in their complaint only that the Use Policy gave the Village "unbridled discretion" in determining who could have access to the Village Hall and thus was unconstitutional, and that the Village Hall was a "public forum" so the Village could not constitutionally restrict public access based on the content of proposed speech. The argument that the

NDP service is a "civic activity" as defined by the Use Policy was not advanced by the plaintiffs until after DeBoer's deposition was taken and the Village had filed its motion for summary judgment. By then, the 1998 event had already passed, and another was not scheduled to take place until May 1999. And the Village's response to the plaintiffs' shift in strategy was simply to maintain its position that prayer can never be a civic activity, no matter what the topic or focus. Because the case developed in this way, we do not expect the Village to have scrutinized prior NDP events in preparing its arguments to this Court.

In addition, the plaintiffs claim that the Village was put on notice of the nature of the NDP event by DeBoer's deposition testimony, in which he described the event and said, "I don't think [the agenda] has changed very much from year to year," *see* DeBoer Dep. Tr. at 37, and that due diligence would have prompted more discovery into the content of past NDP services at that point. In fact, however, DeBoer's testimony does not reveal the true nature nor the full scope of the event:

Q: (Attorney Murphey) ... tell me what happens at a National Day of Prayer meeting, specifically the ones that you have held at the Village Hall.

A: (DeBoer) Typically, it's divided into three parts ... The first is to focus on our national leaders and to engage the group in prayer for our national leaders.

The next [is] to focus the group's attention on state leaders and to engage the group in prayer for state leaders.

And the third one is to focus on community leaders and community circumstances or events and to engage the people who attend in prayer for our local community leaders and events in the community, issues in the community, concerns in the community.

Q: When you say engage the people in prayers, what do you mean by that? Lead people in prayers?

A: The leader will offer short prayer and encourage the people to break up

into small groups ... and huddle for prayer until the next leader interrupts.

Q: Is there anything else that takes place other than what you have described ... ?

A: Typically there is a welcome. There is a song that's been written and distributed by the National Day of Prayer Organization ... The title of the song is called, "Heal Our Land" ... That's pretty much the extent of it.

Q: Is it a Christian event insofar as, are the prayers directed at Jesus Christ or toward Jesus Christ?

A: Everyone prays as he or she will. No one is directed in their prayers.

Q: My question is: Are the leaders focusing their efforts from a Christian perspective?

A: I have never asked the leaders what their religious background is. I expect, from having heard them in conversation, that most of them had a Christian orientation.

Dep. Tr. at 20–23. This description of the event, given under oath, would not necessarily alert the Village that it needed further discovery to determine whether past NDP celebrations in Oak Park contained only the prayers described or also included additional material unrelated to civic leaders, so we excuse the Village from not finding and presenting more precise evidence of the nature of NDP events earlier in the litigation. *See Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525, 1537 (8th Cir. 1996) (litigants are deemed to have exercised due diligence if they "present[ ] a justifiable excuse for not submitting the evidence prior to the summary judgment ruling").

The plaintiffs next argue that the transcript is not material to the issues decided on summary judgment. We think it is, as the question before this Court concerned the content of the proposed service. We expressly relied on the plaintiffs' characterization of their event—as limited to prayer for national, state, and local lead-

ers—in concluding that the proposed service dealt with a "civic" subject matter but did so from a religious perspective, a classification that fit within the parameters of the Use Policy. Based on this understanding we concluded that the Village's action amounted to an attack on the particular (religious) viewpoint to be expressed by the plaintiffs' presentation of their civic message in the form of a prayer. *See DeBoer I,* 53 F.Supp.2d at 988–89 & n. 2.

■ Finally, the plaintiffs contend that the evidence is not likely to change this Court's judgment. To the contrary, we find it to be "of such magnitude that the production of it earlier would have been likely to change the disposition of the case." *Coastal Transfer Co. v. Toyota Motor Sales, U.S.A.,* 833 F.2d 208, 211–12 (9th Cir.1987). We carefully explained in our original opinion that our holding "should be construed narrowly," as limited "to the particular factual situation before us," and warned that "[a]ny variance" to the facts "could very well implicate First Amendment considerations warranting a different result." *DeBoer I,* 53 F.Supp.2d at 992. We "[took] the plaintiffs' word that they intended to engage only in prayer for their community and government leaders," and said that "[i]f in fact the NDP agenda is more expansive than the plaintiffs' applications suggest ... we think that it would be constitutional for the

Village to prevent the group from meeting in the forum, since the proposed activity could no longer pass as 'civic.' " *Id.* at 988 fn. 2. As we describe in more detail below, the transcript reveals that the NDP event held on May 6 was really a sectarian religious service, complete with Bible readings, hymn singing, and a variety of prayers for the Christian Church, far different from what we understood the plaintiffs to have proposed in their application to use the Village Hall. This evidence propels us to reexamine our limited holding as to the propriety of conducting the NDP service in the Village Hall as well as the larger question whether a prayer service—inherently religious in nature no matter what its topic—can ever be classified as "civic" in content.

■ We conclude that the transcript of the May 6, 1999 NDP event qualifies as "newly-discovered evidence" under Rule 60(b)(2), and thus grant the Village's motion for reconsideration of our original opinion in this case.[1]

## II. The Merits

■■ We recognized in our first opinion that restricting access to a nonpublic forum based on the content of the proposed activity does not violate the First Amendment so long as the restrictions are both reasonable and viewpoint-neutral, *see*

1. While we recognize that Rule 60(b)(6)—providing that a district court may grant a motion under Rule 60(b) for "any other reason justifying relief"—should not be invoked in cases where any of the other 60(b) subsections could apply, *see Brandon v. Chicago Bd. of Educ.,* 143 F.3d 293, 295–96 (7th Cir.1998), we think that even if the transcript was not considered newly-discovered evidence, this case would present the sort of "extraordinary circumstances" that would compel us to reconsider our judgment under subsection (6). According to the Supreme Court, Rule 60(b)(6) grants federal courts "broad authority to relieve a party from a final judgment ... 'whenever such action is appropriate to accomplish justice.' " *Liljeberg v. Health Svcs. Acquisition Corp.,* 486 U.S. 847, 863–64, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988) (quoting *Klapprott v. United States,* 336 U.S. 942, 335

U.S. 601, 614–15, 69 S.Ct. 384, 93 L.Ed. 1099 (1949)); *see also Margoles v. Johns,* 798 F.2d 1069, 1072–73 (7th Cir.1986) ("relief under 60(b)(6) is warranted ... upon a showing of extraordinary circumstances that create a substantial danger that the underlying judgment was unjust"). The rationale behind the rule of mutual exclusivity of the subsections of 60(b) "is that the one year time limit applicable to the first three clauses ... would be meaningless if relief was also available under the catchall provision," *Wesco Prods. Co. v. Alloy Automotive Co.,* 880 F.2d 981, 983 (7th Cir.1989), but this 60(b) motion was filed shortly after we issued our opinion, so timing issues are not of concern in this case. And it is not every day that we are presented with reliable evidence of a blatant violation of a federal court order.

*Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.,* 473 U.S. 788, 800, 806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), and held that under this test the Village Hall Use Policy limitation to civic activities is constitutional. The new evidence before us showing what transpired at the 1999 NDP event (representative of past and future NDP events as well[2]), convinces us that the plaintiffs' proposed activity— "prayer for our community, and our local, state and national government leaders"— does not fall within the Oak Park Village Hall's "civic" content restriction and thus its exclusion does not amount to viewpoint discrimination. And, as we will explain further below, we are now convinced that the inherent nature of a prayer service renders the content non-civic, so Oak Park may constitutionally exclude all religious worship services from the Village Hall premises, no matter what the subject matter or focus of the prayer.

First, the transcript shows that the content of the NDP prayer service was primarily religious, not civic. The theme of the 1999 service was "Light the Nation with Prayer," upon which the event leader expanded in his opening speech by saying "And what's that light? Fervent prayer and the gospel of Jesus Christ." Tr. of NDP Svc. at 1, 2. The service leaders read and preached about passages from the New Testament and the teachings of Jesus Christ. The audience was led in the hymn "Heal Our Land," whose verses consist of various quotations from Jesus Christ, such as: "If my people will humbly pray and seek my face and turn away from all their wicked ways, then I will hear them and move my hand freely, then will I forgive, and I will hear their land." Svc. Tr. at 10. A lengthy segment of the service—spanning almost a quarter of the total transcript pages—was "about the church itself." Svc. Tr. at 13. During this part, a pastor preached about the New Testament and the teachings of Jesus Christ and led the group in prayers for "the Church,"

both aloud and silently, eventually defining "the Church" as "the Body of Christ." Svc. Tr. at 14–19. Later, the group sang a song by the name of "Shine, Jesus, Shine," which was followed by a closing prayer that quoted the New Testament and prayed "for our church and ... for our government," asking Jesus Christ, for example, to

> Teach us to put on the breastplates of righteousness. Not that we've become so holy and so sanctified ourself, Lord God ... So that we can rest assured that we are covered with the blood. And that we are knowing the word of God because we have studied and willing to show ourselves to prove. Oh Lord God, and as we take the sword, as we go out forth from this place, using the word of God to cut up and to tear up, but not to tear down, not to destroy, but using the sword to cut up, so that we can build back a great nation. A great nation that you love. That we can build up a community ... that you will accept, Lord God. That we will build up a Church. A church that will worship and praise you, not because of who we are, but just because of who you are.
>
> Lord God we just want to praise you this evening. We want to glorify your name. We want to lift up and say Hallelujah, thank you Jesus, for you are a mighty God. You are a good God, and without you we are nothing.

Svc. Tr. at 25–26. Though in and of itself the substance of this service is not objectionable, it does not belong in the Oak Park Village Hall given the reasonable and viewpoint-neutral content restrictions of the Village's Use Policy. True, sprinkled in between the above prayers were some prayers and preachings about the community, the nation, and our government leaders (a number of whom were mentioned by name). But this was by no means the primary focus of the service, and a few

---

**2.** As we observed earlier, the plaintiffs acknowledged that the event is substantially similar from year to year. *See* DeBoer Dep.

Tr. at 37; Pl's Opp. to Def's Mot. for Reconsideration at 9.

minutes here and there dedicated to civic issues "does not transform the entire service into a civic affair." *DeBoer I*, 53 F.Supp.2d at 988 n. 2. Now convinced that the NDP service is not primarily civic in content, we find the Village's exclusion of it to be constitutionally permissible.

And because we now realize that the line between civic and non-civic prayer is too fine to be drawn by the law, we also reverse our holding that some prayer addressing civic subjects may be categorized as "civic" in content. Our original holding turned in large part on perceived factual differences between this case and *Bronx Household*, where the Second Circuit concluded that the exclusion of religious services from a forum similar to the Village Hall was a viewpoint-neutral content restriction and as such was constitutional. *See Bronx Household of Faith v. Community Sch. Dist. No. 10*, 127 F.3d 207, 215 (2d Cir.1997), *cert. denied*, 523 U.S. 1074, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998). Upon reexamination of the facts of this case, however, we are persuaded that it is not substantially distinguishable from *Bronx Household*.

In *Bronx Household*, a New York Board of Education policy governing the use of city school buildings permitted groups to hold "social, civic and recreational meetings and entertainments" on the premises, but also stated:

No outside organization or group may be allowed to conduct religious services or religious instruction on school premises after school. However, the use of school premises by outside organizations or groups after school for the purpose of

discussing religious material or material which contains a religious viewpoint or for distributing such material is permissible.

*Id.* at 210. A church wanted to conduct "religious services" in a middle school, including "hymn singing, communion, Bible reading, Bible preaching and teaching." *Id.* at 215. The Second Circuit found that a distinction could be easily drawn between "worship and religious instruction" on the one hand, and the other forms of speech—about secular matters from a religious perspective—that the school district was willing to allow in school buildings. *Id.* at 214–15.[3]

Judge Cabranes concurred with the decision to uphold the ban on religious worship services, explaining that "there is no real secular analogue to religious 'services,' such that a ban on religious services might pose a substantial threat of viewpoint discrimination between religion and secularism." *Id.* at 221 (Cabranes, J., concurring in part and dissenting in part). He continued:

Because "services" are by definition religious in nature, it does not appear that they could ordinarily be understood to serve as a vehicle for both religious and secular viewpoints. I am therefore satisfied—while recognizing that the line between permissible "content" discrimination and impermissible "viewpoint" discrimination "is not a precise one,"— that the District's ban on religious "services" . . . is best described as a form of "content" discrimination that does not favor one viewpoint over another.

---

**3.** Similarly, in *Full Gospel Tabernacle*, the plaintiffs contended that the proposed religious worship services—including preaching, Bible teaching, and prayer—were forms of speech falling within the category of "social, civic and recreational meetings . . . and other uses pertaining to the welfare of the community," that merely presented a religious, rather than a secular, perspective, and thus that excluding such services from the forum would be unconstitutional viewpoint discrimination. *See Full Gospel Tabernacle v. Community Sch. Dist. 27*, 979 F.Supp. 214, 223 (S.D.N.Y.

1997), *aff'd*, 164 F.3d 829 (2d Cir.1999), *cert. denied*, —— U.S. ——, 119 S.Ct. 2395, 144 L.Ed.2d 796 (1999). The *Full Gospel* court followed *Bronx Household*, and held that although "[t]he distinction between content and viewpoint is 'not a precise one,'" the distinction between religious worship and the discussion of religious material or material which contains religious viewpoints "is tenable." *Id.* at 223–24 (quoting *Rosenberger v. Rector and Visitors of the Univ. of Virginia*, 515 U.S. 819, 831, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)).

*Id.* We agreed with this reasoning in our original opinion and still do, and we now find it applicable to the instant case not only because of the new evidence regarding the substance of the service, but also because we believe that religious prayer services are inherently non-civic in content. The NDP transcript itself illustrates the distinct difference between a prayer service—even one addressing civic issues—and a discussion about civic matters that presents religious viewpoints. Prayer and prayer services are distinctly different in nature from other forms of expression, not just because of the manner in which—or the viewpoint *from* which—the speaker's thoughts are expressed, but also in the substance of the expression. In prayers, the content and the manner of expression are so closely intertwined, and the form of the expression seems to transform even otherwise secular topics into religious subject matter. So we find the Village's distinction to be sound, and will let stand its ban of religious worship services from the Village Hall as not primarily "civic" in content.

Furthermore, forcing the Village repeatedly to scrutinize proposed prayer services to determine whether they will be primarily religious or civic would likely lead to its "excessive entanglement with religion," in violation of the Establishment Clause. *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The required task of this Court to parse through the NDP transcript line-by-line when considering the instant motion for reconsideration is a judicial involvement that should not be a regular or ongoing one, and we do not want the Village to have to draw these lines and thereby entangle itself in classifications potentially tied to or influenced by theological beliefs.

The Village claims that if we find that the plaintiffs' proposed event is not civic and thus that barring the NDP from the Village Hall is constitutional, we must vacate the rest of our opinion regarding the constitutionality of other Use Policy provisions because the plaintiffs would no longer have standing to challenge the policy.

As we pointed out in our original opinion, however, this argument ignores longstanding Supreme Court precedent holding that a facial challenge lies whenever "a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity." *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 755–56, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). In fact, " 'one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license.' " *Id.* (quoting *Freedman v. Maryland,* 380 U.S. 51, 56, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965)). And the Supreme Court reiterated more recently that "[a]n overbroad regulation may be subject to facial review and invalidation even though its application in the case under consideration may be constitutionally unobjectionable." *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 129, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). So we decline to disturb our holding striking the requirement that activities conducted in the Village Hall "benefit[ ] the public as a whole" as unconstitutionally overbroad, cloaking Village officials with unfettered discretion to permit or deny access to the Village Hall based on constitutionally impermissible criteria such as viewpoint.

Along the same lines, we will not vacate our holding that the Policy's requirement that activities "not be based on or ... promote or espouse the philosophy, ideas, or beliefs of any particular group, entity, or organization" is unconstitutionally viewpoint-discriminatory on its face. Even though we did not strike that provision as being overbroad, the plaintiffs originally challenged it on those grounds, as giving "a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Lakewood,* 486 U.S. at 759, 108 S.Ct. 2138. Like the "benefits the

public as a whole" clause, the "promote or espouse" provision may operate as a prior restraint and thus destroy our freedom of speech, as it creates a substantial risk that parties who want to use the Village Hall will engage in self-censorship. *See id.* at 757, 108 S.Ct. 2138. A facial challenge to the provision is appropriate because this potential for a "chilling effect" exists whether or not these particular plaintiffs qualify for access to the Village Hall under the other criteria of the Use Policy. *See Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, 172 F.3d 397, 407 (6th Cir. 1999).

### III. Conclusion

For the foregoing reasons, we vacate the portion of our February 18 opinion granting summary judgment to the plaintiffs on their viewpoint discrimination claim and ordering the Village to allow the plaintiffs to hold the NDP event in the Village Hall. We decline, however, to reverse our holdings that the Village Hall Use Policy's requirements that every event held there "benefits the public as a whole" and may not "be based on or ... promote or espouse the philosophy, ideas or beliefs of any particular group, entity, or organization" are facially unconstitutional.[4]

It is so ordered.

---

4. In light of the outcome of this case upon reconsideration, we dismiss the motion for attorneys fees currently pending before this Court. Should any party choose to file a new motion for attorneys fees, we will set a new briefing schedule at that time.